38 Cal.3d 413 (1985)
696 P.2d 656
212 Cal. Rptr. 162
MARCELLA G. ALOY, Plaintiff and Appellant,
v.
EUGENE A. MASH, Defendant and Respondent.
Docket No. S.F. 24639.
Supreme Court of California.
March 28, 1985.
*414 COUNSEL
Miles, Sears & Eanni, Richard C. Watters and William J. Seiler for Plaintiff and Appellant.
*415 James L. Stevens, Jr., as Amicus Curiae on behalf of Plaintiff and Appellant.
R. Gaylord Smith, Conrad R. Aragon, M. Patricia Marrison and Lewis, D'Amato, Brisbois & Bisgaard for Defendant and Respondent.
Ronald E. Mallen and Long & Levit as Amici Curiae on behalf of Defendant and Respondent.
OPINION
KAUS, J. 

I
Marcella G. Aloy, plaintiff in a legal malpractice action, appeals from a summary judgment for defendant Eugene A. Mash, her former attorney in a 1971 dissolution action against her husband Richard. Marcella's claim of legal malpractice is based on defendant's failure to assert a community property interest in Richard's vested military retirement pension.[1]
Marcella employed defendant Mash in January 1971 to represent her in the dissolution action. Richard was then on active military service and was therefore not receiving a pension although he had been in the service for over 20 years and was eligible to retire. (10 U.S.C. § 8911.) Defendant failed to claim any community property interest in Richard's pension and it was not put in issue in the dissolution action. The final decree of dissolution was entered in December 1971. Richard retired sometime between 1971 and 1980.
*416 In 1971, the California view regarding the characterization of vested federal military retirement pensions as community or separate property was unsettled. In 1974, however, we held that federal preemption did not bar treating such federal military pensions as community property. (In re Marriage of Fithian, supra, 10 Cal.3d 592.)
In 1980, Marcella filed a complaint against defendant alleging that he negligently failed to assert her community property interest in Richard's military retirement pension, which failure prevented her from receiving any share of his gross military retirement pension benefits "from either the date of separation and/or the date of [his] retirement."
Defendant moved for summary judgment on the ground that in 1971 the law regarding the character of federal military retirement pensions was unsettled, and that he had exercised informed judgment and was therefore immune from a claim of professional negligence. He submitted a declaration stating, among other things: "2. In 1971, it was my practice to read advance sheets, particularly in the dissolution area, an area in which I have regularly practiced. I would therefore have had knowledge of specific decisions at the time they were rendered or shortly thereafter. [¶] 3. In 1971, I relied on the case of French v. French, 17 Cal.2d 775 (1941) as authority that a nonmatured military pension, that is, one owned by a person on active military duty, was not subject to division upon dissolution. I was also aware that in 1971 this case had not yet been overruled. I read the decision In re Marriage of Fithian, 10 Cal.3d 592 (1974) shortly after it was issued in 1974. [¶] 4. I drafted the terms of the interlocutory decree based on my research, knowledge, and understanding of the law in 1971."
Marcella opposed the motion, asserting that it was a triable issue whether defendant had made an informed decision. She submitted excerpts from her deposition testimony in which she stated that the one time she asked defendant whether she was entitled to a portion of Richard's military retirement pension, he told her she had no such right because Richard was still on active duty. Marcella also submitted excerpts from defendant's deposition testimony where he discussed his knowledge and research as follows: "MR. WATTERS: Q. Are you a regular reader of the advance sheets, say from 1971 up until now? [¶] A. I read them. I get them in the office but I can't recall when I started getting them, frankly. Whether I got them in 1971, I don't know. I used to read the advance sheets all the time but I don't know when I got them. I still skim them, review them, when I can. [¶] Q. You review the cases in your particular area of practice? [¶] A. Yes, I do. [¶] Q. That would include the domestic area, up until you stopped doing domestic work, or slowed down? [¶] A. Right. [¶] Q. As of 1971, what was your case authority for your position that when someone in the *417 military service was on active duty that their pension was not community property, what was your authority? [¶] A. I don't know what I checked with at that time. Probably the French case would be the authority. [¶] Q. A 1941 case? [¶] A. Whatever the date is. [¶] Q. Sir, any other authority that you can cite me other than the French case for that belief that you had? [¶] ... [¶] A. I can't recall what else, what I might have looked up at that point. Might have been something else but I don't ... [¶] A. Well, this is again going back to my thinking, what I might have thought back then, and I'd have to say probably the same thing, that if a person has been in the military, active military duty, was not drawing his pension, that it was not an item to be divided at that time. [¶] Q. This would be true when the person was in the service over twenty years, over twenty or under twenty years? [¶] MRS. MARRISON: Q. Do you understand the question? [¶] A. I presume he is asking what was in my mind at that time and I'm not sure in this case at that time what was in my mind. I'm not sure what I would have stated at that time. If you ask me the question in 1971, is that what you're asking?"
Marcella further submitted a declaration by James J. Simonelli, which stated that he was an attorney with an extensive practice in family law since 1970, and that in 1971 attorneys in the family law field in the San Joaquin Valley uniformly claimed a community property interest in vested military retirement pensions. Simonelli further stated that had he been representing Marcella in November 1971, he would have advised her that she had some community property interest in Richard's vested military retirement pension and that the only issue as to that interest was whether federal law preempted state enforcement of such an interest.

II
The criteria on appeals from summary judgments are too familiar to need restatement. In brief, if the record discloses triable issues with respect to negligence, causation and damages, the judgment must be reversed.
In Smith v. Lewis (1975) 13 Cal.3d 349 [118 Cal. Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231]  a legal malpractice case based on an attorney's 1967 failure to claim a community property interest in the husband's vested retirement benefits  we affirmed a judgment for plaintiff and rejected the defendant attorney's contention that he should not be liable for mistaken advice when well-informed lawyers in the community had entertained reasonable doubt at the time as to the proper resolution of the legal issue. We found the situation in no way analogous to that in Lucas v. Hamm (1961) 56 Cal.2d 583 [15 Cal. Rptr. 821, 364 P.2d 685], involving the esoteric subject of the rule against perpetuities. We conceded that in 1967 the law *418 regarding the community character of the husband's federal pension was unsettled. We said, however: "If the law on a particular subject is doubtful or debatable, an attorney will not be held responsible for failing to anticipate the manner in which the uncertainty will be resolved. [Citation.] But even with respect to an unsettled area of the law, we believe an attorney assumes an obligation to his client to undertake reasonable research in an effort to ascertain relevant legal principles and to make an informed decision as to a course of conduct based upon an intelligent assessment of the problem." (Id. at pp. 358-359.)
Smith v. Lewis, supra, 13 Cal.3d 349, is obviously of little help to defendant. His motion for summary judgment was, in fact, primarily based on Davis v. Damrell (1981) 119 Cal. App.3d 883 [174 Cal. Rptr. 257]  a similar case in which Damrell, the wife's attorney, in 1970 failed to assert a community property interest in the husband's vested federal military retirement pension. The husband retired in 1973, and the wife filed suit against Damrell sometime thereafter. The Court of Appeal affirmed the summary judgment for Damrell on the ground that he had demonstrated compliance with the Smith v. Lewis standards by showing a thorough, contemporaneous research effort on an issue of unsettled law. He had submitted a declaration describing his detailed knowledge of legal developments and debate in the field. He traced his familiarity with the line of cases following the earlier French rule (French v. French (1941) 17 Cal.2d 775 [112 P.2d 235, 134 A.L.R. 366] [nonvested military pension was mere expectancy not subject to division as community property]), overruled in In re Marriage of Brown (1976) 15 Cal.3d 838 [126 Cal. Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164], and recounted his special interest in the Wissner case (Wissner v. Wissner (1950) 338 U.S. 655 [94 L.Ed. 424, 70 S.Ct. 398] [establishing the supremacy of a federal statute governing disposition of the proceeds of a military service life insurance policy]), which had motivated him to follow its progress from its inception.
Defendant's reliance on Davis v. Damrell, supra, 119 Cal. App.3d 883, is ill-advised, since the differences between his professional conduct and that of the defendant in that case inexorably point to potential liability on defendant's part. In brief, in Davis the defendant attorney was thoroughly familiar with all the pertinent authorities, state and federal, and had reached the conclusion, based primarily on Wissner v. Wissner, supra, 338 U.S. 655, that vested military pension benefits were not subject to California community property rules. His decision not to claim a community property interest in the husband's military pension was not actionable, as it represented "a reasoned exercise of an informed judgment grounded on a professional evaluation of applicable legal principles." (Id., 119 Cal. App.3d at *419 p. 888.)[2] Defendant, by contrast, relied on a single case  French v. French (1941) 17 Cal.2d 775 [112 P.2d 235, 134 A.L.R. 366] for the proposition that a nonmatured military pension was not subject to division on dissolution. At his deposition he never did answer the question whether he was aware that a military pension vests after 20 years of service, whether the serviceman retires or not. This would have been a vital point in his research, for in French v. French itself a dictum indicates that after retirement pay vests it becomes community property. (Id. at p. 778.)[3] He thus never even gave himself a chance to consider whether his client was entitled to a community share in monthly payments which, but for the husband's election not to retire, would have been vested pension payments. (See In re Marriage of Gillmore, supra, 29 Cal.3d 418, 423; Waite v. Waite (1972) 6 Cal.3d 461, 472 [99 Cal. Rptr. 325, 492 P.2d 13].)
(1) In sum, this is not a case where the defendant attorney, basing his judgment on all available data, made a rational professional judgment not to claim an interest in the husband's pension. Rather, he acted  more precisely, failed to act  on an incomplete reading of a single case, without appreciating the vital difference between a member of the armed forces who has not yet served long enough to be eligible to retire and one who has but chooses to stay in the service. As far as the issue of federal preemption is concerned, the record does not show that he ever considered it.
In sum, the record on which the motion for summary judgment was argued presented a triable issue of negligence.

III
The question whether the defendant's negligence caused damage in some amount need not detain us long. Footnote 9 to Smith v. Lewis, supra, 13 Cal.3d at pages 360-361, makes this an a fortiori case. (See also Martin v. Hall (1971) 20 Cal. App.3d 414, at pp. 423-424 [97 Cal. Rptr. 730, 53 A.L.R.3d 719].) Nor  the arguments based on McCarty v. McCarty (1981) 453 U.S. 210 [69 L.Ed.2d 589, 101 S.Ct. 2728], aside  do we understand defendant to claim otherwise.

*420 IV
McCarty v. McCarty, supra, decided on June 26, 1981, held that the application of community property principles impermissibly conflicts with the federal military retirement scheme. This, of course, happened a decade after defendant had represented plaintiff. Nor, unlike the defendant attorney in Davis v. Damrell, supra, 119 Cal. App.3d 883, had defendant anticipated this development. (2) Nevertheless he seeks to take advantage of McCarty in two ways: first, he argues that had he asserted a community property interest in Richard's pension, the United States Supreme Court case which invalidated any favorable ruling by a California court might have been Aloy v. Aloy, rather than McCarty v. McCarty; second, he argues that it simply cannot be actionable malpractice not to assert a claim which is eventually found to be invalid.

A
Defendant's first argument assumes, of course, that McCarty v. McCarty once and for all settled the question of Colonel McCarty's pension in his favor. Solely because we happen to know judicially that the McCarty controversy is far from over and do not wish to make any unnecessary statement which might affect its outcome, we shall assume defendant's hypothesis to be true.[4]
Assuming further that it is a legitimate subject of inquiry whether, at the critical time, the early '70's, the United States Supreme Court would have granted certiorari on the issue whether states could hold military pensions to be community property, all the available evidence is negative. After we first decided in favor of the nonmember spouse in Fithian, certiorari was denied (Fithian v. Fithian (1974) 419 U.S. 825 [42 L.Ed.2d 48, 95 S.Ct. 41]), as was a petition for rehearing. (Fithian v. Fithian, supra, at p. 1060 [42 L.Ed.2d 657, 95 S.Ct. 644].) Shortly thereafter we reaffirmed Fithian in In re Marriage of Milhan (1974) 13 Cal.3d 129 [117 Cal. Rptr. 809, 528 P.2d 1145]. Again certiorari was denied. (Milhan v. Milhan (1975) 421 U.S. 976.) Nothing in the Aloy v. Aloy litigation suggests to us that it was *421 more likely than Fithian or Milhan to persuade the high court that the military pension issue was one whose time had come.[5]

B
Finally we turn to the argument that the summary judgment was correct because the claim which defendant negligently failed to assert in 1971 luckily turned out to be worthless in 1981  the serendipity defense. This argument is not based on any theory that in point of fact Marcella would not have benefited financially had a community property claim to Richard's pension rights been asserted in 1971. (See pt. III, ante.) Rather, defendant simply asserts that he was under no "duty to secure for plaintiff benefits to which she was not legally entitled."[6]
It is evident from the way defendant makes his point  "benefits to which she was not legally entitled"  that he assumes as a premise of his argument that McCarty has been retroactively applied and that, therefore, in a real sense McCarty "was" the law 10 years before it was decided, when defendant acted for Marcella.
Whatever may be said in favor of defendant's theory were this premise correct, the fact is that no case within our memory has received less retroactive application than McCarty. Starting with the last paragraph of the McCarty opinion itself, the judicial and legislative branches, state and federal, cooperated in a massive and largely successful drive to make McCarty disappear  prospectively, presently and retroactively. Some highlights of that effort are noted below.[7] The result is that, for most purposes, McCarty *422 not only is not the law but never really was. As one Court of Appeal put it: "[T]here is no longer any McCarty rule to be retroactively applied." (In re Marriage of Frederick (1983) 141 Cal. App.3d 876, 880 [190 Cal. Rptr. 588].) It would be ironic if the chief legacy of McCarty were the immunization of legal malpractice by an attorney who never even pondered the issues which fathered McCarty's brief life.
The judgment is reversed.
Mosk, J., Grodin, J., and Ramsey, J.,[*] concurred.
REYNOSO, J.
I respectfully dissent. With the exception of the majority opinion, I know of no case which suggests that an attorney whose advice is correct may be held liable for malpractice.
*423 Relying on the standard developed in Smith v. Lewis (1975) 13 Cal.3d 349 [118 Cal. Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231] and its progeny,[1] the majority concludes that an attorney may face malpractice liability despite the fact that the law is ultimately resolved in accordance with the advice given. Although this application of the Smith standard follows logically from its emphasis on the duty of care owed a client, it nonetheless raises a troubling anomaly: where the law is unsettled, the attorney who gives advice later determined to be correct may well have committed malpractice, while the attorney whose advice turns out to be erroneous may avoid liability entirely.
The law cannot tolerate such incongruous results. As Justice Holmes so aptly observed long ago, "[t]he life of the law has not been logic: it has been experience." (Holmes, Common Law (1881) p. 1.) Experience now tells us that the Smith standard, however rational and well-suited to its original purpose, no longer makes sense. We must therefore formulate a new standard that draws a fair and reasonable distinction between culpable and nonculpable practitioners.
The defect inherent in the Smith standard, made ever clearer by today's majority opinion, is that the concept of legal error is confused with that of fault, converting a question of law into one of fact. Malpractice consists of four elements: duty arising out of the attorney-client relationship, breach of that duty, causation and damages. The second element breaks down further into two components: legal error and failure to use "such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake." (Lucas v. Hamm (1961) 56 Cal.2d 583, 591 [15 Cal. Rptr. 821, 364 P.2d 685].) The first is a question of law, the second a question of fact.
The question of whether an attorney erred necessarily must be resolved before any issue of negligence arises. An attorney who renders erroneous advice may not be negligent in doing so. (See Davis v. Damrell (1981) 119 Cal. App.3d 883 [174 Cal. Rptr. 257].) A second attorney may fail to perform adequate research but somehow give his client accurate advice. Neither of these attorneys has committed malpractice. (See Mallen & Levit, Legal Malpractice (2d ed. 1981) § 250, p. 317.)
*424 Where the law is settled, it is relatively easy to determine whether the attorney's advice was erroneous. Problems arise only with respect to issues of law that are unresolved or in a state of flux at the time the advice is given. In either instance, however, the question of whether the advice was wrong is a question of law.
Ironically, Smith itself reflects this basic approach. At the outset of the analysis the court stressed: "the crucial inquiry is whether his advice was so legally deficient when it was given that he may be found to have failed to use `such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake.' [Citation.] We must, therefore, examine the indicia of the law which were readily available to defendant at the time he performed the legal services in question." (Id., at p. 356.) (Italics added.)
Thus, Smith initially proposed a two-step test for determining whether an attorney has been negligent. As noted, the threshold inquiry is a legal one, whether adequate legal authority existed at the time to support the advice given. Only when this question is answered in the negative is it necessary to move to the second part of the test, the factual inquiry as to whether the attorney breached the standard of care in rendering the erroneous advice.
Applying this test to the case at bar reveals that Attorney Mash did not err in advising his client in 1971 that her husband's federal military pension was not community property. As the majority notes, "[i]n 1971, the California view regarding the characterization of vested federal military retirement pensions as community or separate property was unsettled." (Ante, p. 416.) In fact, Mash relied on an opinion of this court, French v. French (1941) 17 Cal.2d 775 [112 P.2d 235, 134 A.L.R. 366], in concluding that the pension was not divisible. As French remained good law, this reliance was neither unreasonable nor erroneous. Because Mash committed no error, the malpractice claim must fail.
It is imperative that a lawyer remain free to choose one of a number of reasonable and legally supportable solutions to an otherwise unsettled legal question and advise the client accordingly without facing a malpractice suit.
Bird, C.J., and Taber, J.,[*] concurred.
NOTES
[1] The pension was vested because Richard had been in the service for over 20 years and thus had an unconditional right to it upon retirement.

It is unclear whether the pension could also be termed "matured." There is some inconsistency in the definition of a "matured" pension. Most cases define it as one in which all conditions precedent to the payment of the benefits have taken place or are within the control of the employee. (In re Marriage of Gillmore (1981) 29 Cal.3d 418, 422, fn. 2 [174 Cal. Rptr. 493, 629 P.2d 1]; In re Marriage of Fithian (1974) 10 Cal.3d 592, 596, fn. 2 [111 Cal. Rptr. 369, 517 P.2d 449]; Smith v. Lewis (1975) 13 Cal.3d 349, 355, fn. 4 [118 Cal. Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231].) Under this definition the pension was also matured. In re Marriage of Brown (1976) 15 Cal.3d 838, 842 [126 Cal. Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164], however, defined a "matured" benefit as one where there is an "unconditional right to immediate payment"  i.e., where the employee "reaches retirement age and elects to retire." Under the latter definition, Richard's pension had not matured since he was still on active duty.
[2] Amicus, appearing on behalf of defendant, argues that, were the rule otherwise, "[s]elf-defensive instincts would encourage lawyers to provide their clients with the most popular perception of the law rather than their own views. Candor and creativity would be replaced by consensus. Such a rule would be neither in the interest of clients nor lawyers." Brave words, but one suspects that a client whose interests coincide with the popular conception of the law would expect his attorney to advance them, particularly if the consensus is shared by the judiciary.
[3] Presumably the same dictum was belatedly discovered by the defendant in Smith v. Lewis. (See Smith v. Lewis, supra, 13 Cal.3d at p. 358, fn. 7.)
[4] We know nothing about the details of the continuing McCarty litigation. It seems a fair guess, however, that it is somehow affected by the passage of the Federal Uniformed Services Former Spouses' Protection Act of 1982. (Pub.L. No. 97-252, tit. X.) It is, of course, 100 percent speculation whether the mythical Aloy v. Aloy (197_) ___ U.S. ___, would have triggered similar federal legislation.
[5] It is the repeated denial of certiorari which distinguishes this case from Martin v. Hall, supra, 20 Cal. App.3d 414, 423-424. There an attorney retained to represent a client accused of crime, failed to assert the, under the circumstances, plausible bar of the multiple prosecution aspect of Penal Code section 654. His omission took place after we had hinted in Neal v. State of California (1960) 55 Cal.2d 11, 21 [9 Cal. Rptr. 607, 357 P.2d 839], that section 654 might preclude multiple prosecutions even in situations in which multiple punishment would be permissible. Kellett v. Superior Court (1966) 63 Cal.2d 822 [48 Cal. Rptr. 366, 409 P.2d 206], however, which eventually so held, was still some years down the road. On the issue of causation, the Court of Appeal held that it had "no reason to suppose that the result in a hypothetical Martin v. Superior Court would have been different." Here there is every reason to suppose that Aloy v. Aloy would not have escaped the confines of California.
[6] Amicus for defendant makes the same point more subtly by distinguishing between "fault"  conceded  and "error"  disputed.
[7] 1. The United States Supreme Court itself did not think too highly of the result it felt compelled to reach: "We recognize that the plight of an ex-spouse of a retired service member is often a serious one.... That plight may be mitigated to some extent by the ex-spouse's right to claim Social Security benefits, cf. Hisquierdo, 439 U.S., at 590, and to garnish military retired pay for the purposes of support. Nonetheless, Congress may well decide, as it has in the Civil Service and Foreign Service contexts, that more protection should be afforded a former spouse of a retired service member. This decision, however, is for Congress alone." (McCarty v. McCarty, supra, 453 U.S. at pp. 235-236 [69 L.Ed.2d at p. 608].)

2. Congress, as part of the fiscal 1983 defense bill passed title X of Public Law No. 97252, the Federal Uniformed Services Former Spouses' Protection Act (FUSFSPA) which, in effect, nullified McCarty prospectively and, in part, retroactively. (See 10 U.S.C. § 1408 et seq.; § 1006 of the act allows enforcement of pre-McCarty judgments.)
3. Even without the benefit of or reliance on FUSFSPA, our cases uniformly held that pre-McCarty judgments treating military pensions as community property were not affected by McCarty. (In re Marriage of Camp (1983) 142 Cal. App.3d 217, 219-221 [191 Cal. Rptr. 45]; In re Marriage of Parks (1982) 138 Cal. App.3d 346, 348-349 [188 Cal. Rptr. 26]; In re Marriage of McGhee (1982) 131 Cal. App.3d 408, 411 [182 Cal. Rptr. 456]; In re Marriage of Fellers (1981) 125 Cal. App.3d 254, 256-258 [178 Cal. Rptr. 35]; In re Marriage of Sheldon (1981) 124 Cal. App.3d 371, 377-380 [177 Cal. Rptr. 380].) This was declared to be the law even if the case was still pending on appeal at the time of the McCarty decision (In re Marriage of Sheldon, supra, 124 Cal. App.3d at pp. 380-384), unless the member had preserved the preemption issue. (In re Marriage of Jacanin (1981) 124 Cal. App.3d 67, 70-71 [177 Cal. Rptr. 86].) Federal courts agreed. (Wilson v. Wilson (5th Cir.1982) 667 F.2d 497 [cert. den. 458 U.S. 1107 (73 L.Ed.2d 1368, 102 S.Ct. 3485)]; Erspan v. Badgett (5th Cir.1981) 659 F.2d 26, 28 [cert. den. 455 U.S. 945 (71 L.Ed.2d 658, 102 S.Ct. 1443)]; Marriage of Smith (W.D.Tex. 1982) 549 F. Supp. 761, 767.)
4. Courts of Appeal with rare unanimity, seized on FUSFSPA to obliterate all traces of McCarty. (In re Marriage of Sarles (1983) 143 Cal. App.3d 24, 26-30 [191 Cal. Rptr. 514]; In re Marriage of Ankenman (1983) 142 Cal. App.3d 833, 836-838 [191 Cal. Rptr. 292]; In re Marriage of Fransen (1983) 142 Cal. App.3d 419, 427 [190 Cal. Rptr. 885]; In re Marriage of Hopkins (1983) 142 Cal. App.3d 350, 353-361 [191 Cal. Rptr. 70]; In re Marriage of Frederick (1983) 141 Cal. App.3d 876, 879-880 [190 Cal. Rptr. 588]; In re Marriage of Buikema (1983) 139 Cal. App.3d 689, 691 [188 Cal. Rptr. 856].)
5. This pretty much reduced the impact of McCarty to judgments which became final between June 25, 1981, the date of that decision, and February 1, 1983, the effective date of FUSFSPA. The few unfortunate nonmember spouses whose judgments did became final between those dates, were given special permission by the California Legislature to ask that the judgments be modified "to include a division of military retirement benefits payable on or after February 1, 1983, ..." (Civ. Code, § 5124, added by Stats. 1983, ch. 775, § 1, p. 2853.)
It is noted that this court has yet to speak on the matters covered in this footnote. Our purpose in referring to the various authorities is not to present them as immutably correct, but as indicative of general dissatisfaction with McCarty.
[*] Assigned by the Chairperson of the Judicial Council.
[1] Prior to Smith attorneys in California were not liable "for lack of knowledge as to the true state of the law where a doubtful or debatable point [was] involved." (Sprague v. Morgan (1960) 185 Cal. App.2d 519, 523 [8 Cal. Rptr. 347].) Smith modified that rule so that even with regard to an unsettled area of the law an attorney is obligated to "undertake reasonable research in an effort to ascertain relevant legal principles and to make an informed decision...." (Smith, supra, 13 Cal.3d at p. 359.)