206 N.J. Super. 270 (1985)
502 A.2d 94
PETER PROCANIK, AN INFANT, BY HIS GUARDIAN AD LITEM, ROSEMARIE PROCANIK AND ROSEMARIE PROCANIK AND MICHAEL PROCANIK, INDIVIDUALLY, PLAINTIFFS,
v.
JOSEPH PETER CILLO, HERBERT LANGER, ERNEST P. GREENBERG, HAROLD A. SHERMAN, LEE S. GOLDSMITH, AND GREENSTONE, GREENSTONE & NAISHULER, A PROFESSIONAL CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Law Division Union County.
Decided August 20, 1985.
*273 Myron W. Kronisch for plaintiff (Kronisch, Schkeeper & Miltz, attorneys).
Russell L. Hewit for defendants Joseph Peter Cillo, Herbert Langer and Ernest P. Greenberg (Dughi & Hewit, attorneys).
William J. Prout for defendant Harold A. Sherman (Tompkins, McGuire & Wachenfeld, attorneys).
Marc S. Friedman for defendant Lee S. Goldsmith (Kalb, Friedman & Siegelbaum, attorneys).
George Catlett for defendant Greenstone, Greenstone & Naishuler (Catlett & Knapp, attorneys).
BOYLE, J.S.C.
This case involves the pre-termination duties of an attorney who is a specialist in his field arising out of a legal malpractice claim within a medical malpractice suit. The primary issue is whether an attorney, a specialist in malpractice, has the duty, not only to advise his clients on the settled law, but whether he also has a duty to disclose to his clients, clearly and unmistakeably, an opinion held by him that the settled law is ripe for reconsideration. The subject matter, therefore, concerns what constitutes a complete, informed judgment. Additionally, there are contentions of a post-termination duty to advise clients of a *274 decision subsequently reported in the advance sheets and whether these duties are mooted by a prospective application thereafter as to the applicable two-year statute of limitations. The issues arise out of a remand of the Supreme Court, Procanik By Procanik v. Cillo, 97 N.J. 339 (1984) (hereinafter cited as Procanik). Cross-motions for summary judgment have been made by all parties who agree that there are no genuine issues as to any material fact under R. 4:46-2. Therefore, a motion for summary judgment is appropriate for consideration. Judson v. Peoples Bank and Trust Company of Westfield, 17 N.J. 67 (1954).
This case has a lengthy history which requires recitation.

FACTUAL HISTORY
On June 8, 1976, co-plaintiff, Rosemarie Procanik (Procanik), placed herself under the medical care of the co-defendants, Dr. Joseph P. Cillo, Dr. Herbert Langer and Dr. Ernest P. Greenberg, who are board-certified obstetricians and gynecologists who apparently conduct a group practice. Thereafter, Procanik visited the offices of defendant-physicians from time to time. On June 9, 1977, she reported to defendant, Dr. Cillo, that her last menstrual period had been May 4, 1977. She further advised him that she had recently been diagnosed by family-physician as having measles but did not know if it was rubella (German measles). He examined Procanik and ordered "tests for German measles, known as Rubella Titer Test", at Rahway Hospital. The results "were `indicative of past infection of Rubella.'" Instead of ordering further tests, it is alleged that Dr. Cillo negligently interpreted the results and told Procanik that she "had nothing to worry about because she had become immune to German measles as a child." In fact, the "past infection" disclosed by the tests was the German measles that had prompted Procanik to consult the defendant-physicians. Ignorant of what an accurate diagnosis would have disclosed, Procanik allowed her pregnancy to continue and delivered a *275 son, the infant and incompetent, Peter Procanik; he having been born December 26, 1977. On January 16, 1978, the child was diagnosed as suffering from congenital rubella Down's syndrome.
As a result of the doctors' alleged negligence, Procanik was deprived of the choice of terminating the pregnancy, and Peter was "born with multiple birth defects," including eye lesions, heart disease, and auditory defects.
On April 26, 1978, the co-plaintiffs, Rosemarie Procanik and Michael Procanik, her husband, consulted with defendant-attorney, Harold Sherman (Sherman), regarding a possible claim for personal injuries as a result of the alleged medical malpractice of defendant-physicians. As a result of the consultation, Sherman determined that an opinion was necessary from a specialist in medical malpractice. Plaintiffs concede Sherman is a general practitioner in law. On November 6, 1978, Sherman consulted with Lee S. Goldsmith (Goldsmith), who was "of counsel" to the firm of Greenstone, Greenstone & Naishuler (Greenstone), a professional corporation specializing in medical malpractice claims. Goldsmith and Greenstone are also defendant-attorneys in this action. Goldsmith, in addition to being an attorney, is a medical doctor. Answers to interrogatories disclosed that he had handled 300 cases involving medical malpractice. He specializes in medical malpractice cases. It was also conceded that Goldsmith, being "of counsel" (although not an employee of the Greenstone firm) acted as its agent.
Sherman collected plaintiffs' records and any other information regarding this matter and passed them along to defendants, Greenstone and Goldsmith. It was understood that Goldsmith would review the matter and render an opinion to Sherman.
Subsequently, Goldsmith referred the file to Dr. Leslie Iffy, professor of obstetrics and gynecology and director, division of maternal-fetal medicine at the New Jersey University of Medicine and Dentistry, for an expert medical opinion. Discovery *276 revealed various correspondence between Goldsmith, Greenstone and Sherman. Of significance is a letter dated January 29, 1979 from Goldsmith to Greenstone.[1] It is clear from that letter that Goldsmith was aware of Gleitman v. Cosgrove, 49 N.J. 22 (1967), which precluded wrongful birth actions. Goldsmith indicated that in his opinion the Procanik case was an appropriate one to reverse Gleitman. The letter stated "I think the time is right, and I think we have a good shot at reversal." On February 7, 1979, Goldsmith and Greenstone received Dr. Iffy's medical report. In March 1979, Goldsmith delivered the entire file to Greenstone for his review. In a *277 letter to Sherman dated April 26, 1979, Goldsmith and Greenstone decided not to accept the case.[2] They concluded that: (1) *278 Gleitman "prohibits the kind of action that would have to be brought herein"; (2) "It is possible that Gleitman could be reversed"; (3) "that it would have to be taken to the Supreme Court in order to obtain a reversal"; and (4) "The law is dead against us in the State and the reversal would be necessary."
As a result of this letter, Sherman determined to terminate the attorney-client relationship with Procanik. A meeting took place at his office with the Procaniks present. He discussed with them Goldsmith's letter of April 26, 1979, and reviewed a letter with them dated May 2, 1979[3] which constituted a termination *279 of his services for the Procaniks. The letter indicated that Goldsmith was not interested in handling the case, and "his judgment is one on which I would certainly rely." It also advised the Procaniks "that you are free to consult another attorney, who after all, might feel differently about the case." It also advised the Procaniks of the applicable statute of limitations both as to the parents' claims and that of the infant, Peter. It also suggested "that if you want to pursue this matter further, you contact another attorney immediately." After Sherman had been originally retained and before termination of that relationship, the Supreme Court granted certification on September 5, 1978 in Berman v. Allan, 80 N.J. 421 (1979), which was reported in the New Jersey Law Journal (Law Journal), 102 N.J.L.J. 576 (1978). Although all of the defendant-attorneys were readers of the Law Journal, none of them had read this certification in that publication. On February 26, 1979, Berman was argued before the Supreme Court. On July 5, 1979, shortly after the attorney-client relationship had been terminated and memorialized by letter of May 2, 1979, the Law Journal published the notification of the decision of Berman v. Allan, 104 N.J.L.J. 1 (1979), which was decided on June 26, 1979. On July 26, 1979, the full text of the opinion in *280 Berman appeared in the Law Journal, 104 N.J.L.J. 73 (1979). The Berman decision was then published in the advance sheets on August 31, 1979. In Berman v. Allan, 80 N.J. 421 (1979), the Court recognized that parents may recover for emotional distress for the "wrongful birth" of a child born with birth defects. The defendant-attorneys had not read the certification in Berman, reported in the Law Journal prior to termination with the Procaniks, nor, as revealed by answers to interrogatories, could they recall with specificity when, after termination, they had become aware of the reported decision. Consequently, defendant-attorneys never advised the Procaniks that they had a cause of action, and the two-year statute of limitations expired on their claims on January 16, 1980. However, after January 16, 1980, the Procaniks engaged new counsel and a complaint was filed on April 8, 1981, almost 15 months after the statute of limitations had expired and nearly 3 1/2 years after the infant was diagnosed as suffering from congenital rubella Down's syndrome.
Specifically, plaintiffs' complaint alleges that defendant-physicians negligently failed to diagnose a rubella infection early in plaintiff-mother's pregnancy, as a result of which infant-plaintiff was born with multiple birth defects. This medical mal-practice caused them to suffer emotional injury and to incur medical expenses. Plaintiffs also assert that their defendant-attorneys undertook to investigate plaintiffs' potential malpractice claims and, in the course of that undertaking, negligently discharged their professional responsibilities in several ways: (1) by failing to become aware of an appeal pending before the Supreme Court which implicated the areas of medical malpractice law; (2) by advising them that the then settled law in this State precluded their contemplated action without further advising them that "a decision [of the unrelated pending appeal in Berman, supra] could be expected shortly"; (3) if not, that a "precautionary suit" should be instituted; and (4) in failing to advise them, months after their professional relationship had *281 terminated, of the publication of the Court's decision in Berman and its recognition of the actionability of their claim.
Defendant-attorneys, on the other hand, maintain that no duty existed and that the actions exercised by defendant-attorneys were within the standard of care of the legal profession. Defendants also claim that Berman should be applied prospectively and, therefore, the complaint filed by plaintiffs on April 8, 1981 was within a new two-year statute of limitations.
Defendant-physicians filed their answer on May 29, 1981, asserting as an affirmative defense that the parents' claim was barred by a two-year statute of limitations and that the infant's claim failed to state a claim upon which relief could be granted.

ATTORNEY-CLIENT RELATIONSHIP
It has been stipulated by Sherman that an attorney-client relationship existed between defendant-attorneys and plaintiff-clients. However, the specialists in this matter have not conceded that an attorney-client relationship existed. Therefore, this court must initially decide whether a duty was owed by defendant-attorneys to plaintiff-clients because of a fiduciary relationship, i.e., attorney-client.
An attorney-client relationship exists when there is an "identifiable manifestation" that there was reliance on the lawyer in his professional capacity. In re Palmieri, 76 N.J. 51, 60 (1978). In Fuschetti v. Bierman, 128 N.J. Super. 290 (Law Div. 1974), the court held that all that is required in establishing an attorney-client relationship is a statement by an attorney that he would "handle" her matter. An attorney-client relationship is not necessarily dependent upon payment, nor is it dependent upon any written agreement. United States v. Costanzo, 625 F.2d 465, 468 (3 Cir.1980). Courts will look to the party's conduct, not necessarily whether there is a formal contract or fee arrangement. Westinghouse Electric Corp. v. Kerr-McGee Corp., 580 F.2d 1311 (7 Cir.1978); Tormo v. Yormark, 398 F. Supp. 1159 (D.N.J. 1975); George v. Caton, *282 93 N.M. 370, 600 P.2d 822 (1979). Here, a fair reading of the letters of counsel indicates that the client and the cause of action were identified to all interested parties. Sherman had met with plaintiffs to discuss their cause of action and, realizing that this matter needed a specialist's attention, he referred the case to Greenstone and Goldsmith recognizing that Greenstone and Goldsmith specialized in the area of medical malpractice. At all times plaintiffs relied upon the judgment and advice of Greenstone and Goldsmith. Accordingly, this court holds that an attorney-client relationship did exist between the Procaniks and Greenstone and Goldsmith.
Having established that an attorney-client relationship exists, then it must next be determined whether, in fact, a legal duty arose from the relationship.

DUTY
In order to find defendant-attorneys liable for negligence, a legal duty must be found to exist and there must have been a breach of that duty. Fortugno Realty Co. v. Schiavone-Bonomo Corp., 39 N.J. 382, 299 (1963); McIntosh v. Milano, 168 N.J. Super. 466 (Law Div. 1979).
Recently, in Swidryk v. St. Michael's Medical Center, 201 N.J. Super. 601 (Law Div. 1985), the court announced the standards in establishing the existence of duty:
Whether or not a duty exists is ultimately a question of fairness and the inquiry involves a consideration of the relationship of the parties, the nature of the risk and the public interest and proposed solution. [At 606].
Essex v. N.J. Bell Telephone Co., 166 N.J. Super. 124 (App.Div. 1979). It has also been found that public policy considerations must play a major role in the determination of whether a legal duty exists. Wytupeck v. Camden, 25 N.J. 450, 462 (1957).
The standard for determining legal malpractice is that an attorney is obligated to exercise that degree of reasonable knowledge and skill that lawyers of ordinary ability and skill possess. St. Pius X House of Retreats v. Camden Dioc., 88 *283 N.J. 571, 588 (1982), Lamb v. Barbour, 188 N.J. Super. 6, 12 (App.Div. 1982) (citing McCullough v. Sullivan, 102 N.J.L. 381, 384 (E. & A. 1926)); Taylor v. Shepard, 136 N.J. Super. 85, 90 (App.Div. 1975), aff'd o.b. 70 N.J. 93 (1976). Our Supreme Court has adopted a North Carolina court's definition of the standard of care in legal malpractice actions in St. Pius X House of Retreats, supra. when it quoted Hodges v. Carter, 239 N.C. 517, 80 S.E.2d 144 (1954):
Ordinarily when an attorney engaged in the practice of law and contracts to prosecute an action in behalf of his client, he impliedly represents that (1) he possesses the requisite degree of learning, skill and ability necessary to the practice of his profession and which others similarly situated ordinarily possess; (2) he will exert his best judgment in the prosecution of litigation entrusted to him; and (3) he will exercise reasonable and ordinary care and diligence in the use of his skill and in the application of his knowledge to his clients' cause. [239 N.C. at 519, 80 S.E.2d at 145]

PRE-TERMINATION DUTY
Plaintiffs contend that Goldsmith and Greenstone were negligent by not being aware of the Berman certification reported in the Law Journal which, by implication, requires a finding of a duty to read or be aware of the Law Journal. Plaintiffs also claim that upon the publication of the certification in the Law Journal the law on wrongful birth claims became unsettled.
Since there is no dispute factually that Goldsmith and Greenstone, at the time of the rendering of the opinion and before termination of the attorney-client relationship ended, had not read the Berman certification, this court must find whether a duty existed to nevertheless read the certification. This court finds that the specialists had no duty to read the Law Journal and the specific certification that implicated this area of medical malpractice law.
*284 R. 2:12-1 states that the Supreme Court may, on its own motion, certify any action or class of actions for appeal.[4] While it is apparent to this court: (1) That the issue in Berman presented a question of general public importance even though Gleitman had been previously settled by the Supreme Court as to wrongful birth claims; and (2) the decision under review was in potential conflict with the Gleitman doctrine and called for an exercise of the Supreme Court's supervision and other matters in the interest of justice, the certification did not render the law unsettled on wrongful birth claims. The Law Journal admittedly has been designated by the Supreme Court as an official organ for publication of all notices by the courts of New Jersey to the bar of this state with respect to practice and procedure. Practice and procedure involves the rules governing the courts of New Jersey.[5] Although the Law Journal publishes decisions of the courts, it is an unofficial publication in that regard. Reports of cases argued and determined in the courts are officially reported in the advance sheets and subsequently in the bound volumes of the New Jersey Reports and the New Jersey Superior Court Reports. A certification is a signal that the Supreme Court may be reconsidering settled law, not a final decision that the law, in fact, will change. The *285 Law Journal is an official publication involving notice to the bar of the Rules Governing the Courts of the State of New Jersey and any amendments thereto. A certification is not a rule.
This court holds, therefore, that Gleitman was the settled law at the time of the rendering of the opinion letter from Goldsmith to Greenstone dated April 26, 1979 as conveyed to the Procaniks May 2, 1979. This court also holds that the specialists had the right to decline the Procanik case. The closer question is whether the specialists' opinion reflected complete informed judgment. Their opinion certainly gave the settled law, but it did not convey to Sherman, for the benefit of Procanik, what the specialists knew, i.e., that Gleitman was ripe for reconsideration. An examination of the Goldsmith letter to Sherman of April 26, 1979 omits that vital piece of information. It is known that this opinion was held and conveyed by Goldsmith to Greenstone in his letter of January 29, 1979. This court holds that a lawyer has a duty to disclose to his client, clearly and unmistakeably, a complete opinion giving his full informed judgment that the settled law is ripe for reconsideration, particularly when one is held out as a specialist in the complicated field of medical malpractice.
Defendant-attorneys maintain that the exercise of sound professional judgment rests upon considerations of legal perception and not on prescience. Davis v. Damrell, 119 Cal. App.3d 883, 174 Cal. Rptr. 257 (1981). This court agrees. The court in Davis also established a two-prong inquiry for determining whether the legal practitioner is immunized from liability resulting from honest error in judgment: (1) whether the state of the law was unsettled at the time the professional advice was rendered; and (2) whether that advice was based upon the exercise of an informed judgment. Id. 174 Cal. Rptr. at 259. The first inquiry can be resolved since the state of the law was not unsettled at the time the professional advice was rendered. Gleitman, supra. However, as to the second inquiry, the advice was not based upon the exercise of an informed judgment, *286 limited to the facts in this case. In Boss-Harrison Hotel Company v. Barnard, 148 Ind. App. 406, 266 N.E.2d 810, 811 (1971), the court found that good appellate advocacy demands the regular reading of the advance sheets and that these advance sheets constitute central law since they are cases which have yet to be bound in their final volumes.
Also, in Aloy v. Mash, 38 Cal.3d 413, 212 Cal. Rptr. 162, 696 P.2d 656 (1985), the court held that a triable issue of negligence existed where an attorney made an incomplete reading of a 1941 decision.
In Davis the law was clearly unsettled. The California court had yet to determine whether fixed retirement benefits, including military pensions, constituted community property subject to equal division between spouses in the event of a divorce. The attorney in that case could not possibly be found culpable based upon the law that did not exist. In Boss-Harrison Hotel Company, supra, the attorney was found negligent since he failed to advise his client of a case that appeared in the advance sheets. This court agrees that liability should attach in such a situation. Attorneys are absolutely responsible for case law decisions as well as all temporary supplemental official texts of the case law such as an advance sheet. Finally, in Aloy, the attorney based his judgment on the incomplete reading of an officially decided case.
An examination of the letter of April 26, 1979 from Goldsmith to Sherman states: "It is possible that Gleitman could be reversed ..." In the last paragraph, the letter says: "The law is dead against us in the state and a reversal would be necessary." This court finds that although Goldsmith correctly and fully set forth the settled law in New Jersey, he failed to include in his letter to Sherman the clear opinion that he had given Greenstone, which stated: "... and I think we have a good shot at reversal." A fair reading of that phrase indicates an anticipation that the Gleitman doctrine is ripe for reconsideration. On the other hand, Goldsmith's letter to Sherman, *287 while admittedly stating that Gleitman could possibly be reversed, is not in the same context. The former is affirmative; the letter is negative. Furthermore and more importantly, Goldsmith's letter to Sherman of April 26, 1979 is an incomplete informed judgment and opinion. While complete as to the settled law, it is incomplete with respect to the posture for change. Realistically, a client not informed of this additional and vital element of information that Gleitman is ripe for reversal could reasonably allow a jury to conclude that the Procaniks, based upon this advice and counsel of a specialist, would decide that their claim was almost hopeless, and would discourage them from seeking a second opinion.
An attorney's stock in trade is his counsel and advice. The duty involved here is to give the client all of the information in complete form. Here, we had those ingredients in which Greenstone and Goldsmith were perceptive as specialists. Gleitman was a doctrine of long standing. At the time of that holding, abortions were not legal. Subsequently, it was held that abortions were legal. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Goldsmith was aware of the then favorable New York decisions which caused him to be optimistic in this case. Both specialists knew this even without the benefit of the Berman certification.
The law is perpetually in regeneration. This duty does not include predicting with any certainty whether the change will, in fact, occur nor when. A specialist in his field has a duty to be alert, aware and sensitive to the fact that his counsel and advice will have substantial weight and influence on any subsequent decisions that a client might make in pursuing the engagement of another attorney for a second opinion. Historically, we know that the final decision as to Berman was officially reported only a few months after the termination of the attorney-client relationship and well within the two-year statute of limitations applied retrospectively.
*288 A legal expert in medical malpractice, securely perched on the summit of his specialty, must give a complete, informed opinion to the referring attorney for conveyance to the client. He must do no less, nor is more demanded. A specialist has a multi-tier standard of duty. It not only includes the duty generally applicable to those attorneys in the general practice of law, but also a duty of counsel and advice in the specialty involved here  medical malpractice. This can be analogized as it applied to physicians acting in a medical specialty. In Tramutola v. Bortone, 118 N.J. Super. 503 (App.Div. 1972), the court held that one who holds himself out as a specialist must employ not merely the skill of a general practitioner, but also that special degree of skill normally possessed by the average physician who devotes special study and attention to the particular organ or disease or injury involved, having regard to the present state of scientific knowledge.
This duty is not one to guaranty a change in the law, but rather to be aware that a realistic probability exists that the settled law is likely to be reconsidered.
It should be clear that this duty is not to be confused with hindsight or prescience. This duty does not require clairvoyance or the ability to predict as a prophet that the change in the law, in fact, will occur. It has been conceded by plaintiffs that if such a duty exists, it only applied to Greenstone and Goldsmith since they were specialists. Plaintiffs further conceded that Sherman, not being a specialist in medical malpractice, would not have a concurrent duty. Discovery and Sherman's termination letter of May 2, 1979 shows clearly that he, in fact, met the standard of reasonable care applicable to an admitted general practitioner as to this case. He discussed with the Procaniks, Goldsmith's letter to him of April 26, 1979. He clearly relied on the judgment of Goldsmith. He advised his clients "... you are free to consult another attorney, who after all, might feel differently about the case." He advised them as to the statute of limitations. He also stated "I would, therefore, *289 suggest that if you want to pursue this matter further, you contact another attorney immediately." Based on the foregoing, this court holds that Sherman exercised the knowledge, skill and ability ordinarily possessed and exercised by members of the legal profession similarly situated, and he exercised reasonable care and prudence in relying upon the advice of the specialists.

POST-TERMINATION DUTY
Plaintiffs contend that defendants, Greenstone and Goldsmith, were negligent in not calling back their clients (presumably via Sherman) after the Law Journal published the Berman decision on January 26, 1979. For the reasons previously expressed, this court holds that they had no duty to do so since the Law Journal is not an official publication on adjudicatory decisions by the Supreme Court. However, it raises the question as to whether said defendants were negligent in failing to contact their clients after the Berman decision was reported in the advance sheets and subsequently the bound volumes in the New Jersey Reports. Boss-Harrison Hotel Company, supra. Berman was published in the advance sheets on August 31, 1979, well within the remaining period of the statute of limitations. It is contended by the plaintiffs that the nature of the fiduciary relationship between Greenstone and Goldsmith and the Procaniks continued in force and did not terminate on May 2, 1979. They state that just as the obligation of confidentiality remains after termination, so does the duty of care remain as to relevant matters between the clients and the attorneys. Therefore, by not calling their clients to advise them of the Berman decision, said defendants were negligent.
"Generally, absent death or legal insanity of either party, the (attorney-client) relationship terminates only upon the accomplishment of the purpose for which the attorney was consulted, or upon mutual agreement of the parties." Tormo v. Yormark, supra, 398 F. Supp. at 1173. Therefore, the test *290 regarding the termination of an attorney-client relationship asks (1) if there was a clear and unmistakeable termination by the attorney, or (2) whether the purpose for which the attorney has been retained has been fulfilled.
The case in New Jersey which sets forth the first criterion regarding termination of the attorney-client relationship is 536 Broad St. Corp. v. Valco Mortgage Co. Inc., 135 N.J. Eq. 361 (Ch. 1944), aff'd 138 N.J. Eq. 431 (E. & A. 1946) cert. den. 330 U.S. 821, 67 S.Ct. 772, 91 L.Ed. 1272 (1947). The facts in that case are distinguishable. There, an attorney made an attempt to terminate the relationship with his client, and subsequently dealt against the client's best interest. The court held that a termination must be clear and unmistakeable and that the attempt by the attorney to do so failed in that regard and, therefore, the attorney had a continuing fiduciary relationship after the attempted termination.
Here, the termination was clear and unmistakeable. However, there is an additional ingredient: the attorney-specialists' opinion lacked full disclosure and was an incomplete conveyance of their opinion to their clients. Therefore, the second criterion in terminating an attorney-client relationship was not met in that they did not accomplish the purpose for which they were hired. Plaintiffs contend that Greenstone and Goldsmith had a post-termination duty. A jury could find that their relationship with the clients never terminated because the purpose of their retention was not fulfilled and, therefore, a pre-termination duty merely continued. Under the facts of this case, if the specialists are found to have breached a duty in the pre-termination stage, they cannot utilize that wrong in evading responsibility subsequently.
The second criterion which this court imposes upon the specialists is not without precedent in the medical profession. In the case Tresemer v. Burke, 86 Cal. App.3d 656, 150 Cal. Rptr. 384, 12 A.L.R. 4th 27 (1978), the court held that a physician had a duty to notify his client two years after the insertion of a *291 dalcon shield that it could cause medical complications. The court stated that the patient had a cause of action by virtue of a confidential relationship between doctor and patient. The mal-practice action was imposed from the continuing status of the physician-patient where the danger arose from that relationship. The situation in Tresemer is analogous to the case at bar. Although Tresemer involved a physician-patient relationship, the courts have continually held that similar rules of law and duties are applicable to physicians and attorneys. McCullough v. Sullivan, 102 N.J.L. 381, 384 (E. & A. 1925); Stewart v. Sbarro, 142 N.J. Super. 581, 590 (App.Div. 1976).
Accordingly, questions for the jury exist in that they might find: (1) a breach of the pre-termination duty involving an obligation to advise the clients that their case was ripe for reconsideration; (2) a breach of the post-termination duty involving an obligation to advise the clients of the favorable decision in Berman which would have prevented their medical malpractice claim from being time barred; and (3) that if there was a pre-termination duty that was breached by Greenstone and Goldsmith; the fiduciary relationship, limited to full disclosure, continued after the termination.

LAW OF THE CASE
This court now addresses an additional argument by defendant-attorneys that the statute of limitations respecting the parents' wrongful birth claim did not begin to run until Berman was decided. This issue can also be disposed of by the law of the case doctrine which is applicable.
During the early stages of this case, the trial court held that the medical malpractice claim was time barred by the statute of limitations; moreover, defendant-attorneys offered no opposition to dismissal of the parents' claim of medical malpractice. Subsequently, the Appellate Division denied defendant-physicians' cross-motion to strike and further denied the motion of co-defendant, Sherman, for a stay and to consolidate. It is *292 apparent that the Appellate Division by denying defendant-physicians' cross-motion to strike defendant-attorneys' motion for a stay of the legal malpractice issue indicated that it did consider the statute of limitations theory of Sherman and plainly rejected it. More importantly, the action taken by the Supreme Court in Procanik speaks for itself. Although the attorney malpractice claim was not duly considered, the Court did discuss the timeliness of the parents' medical malpractice claim. The Court held that the parents' wrongful birth claim was not derivative of the parents' claim and, therefore, the parents' claim was "barred by N.J.S.A. 2A:14-2." Procanik, 97 N.J. at 356. The lower court rulings which foreclosed the parents' claim as time barred were subject to review by the Supreme Court under the plain error rule, R. 2:10-2, and it did consider issues raised during the course of litigation which were not brought before it on certification. Plain error has been defined as an alleged legal impropriety affecting substantial rights and of a sufficiently grievous nature resulting in the clear capacity to bring about an unjust result. State v. Gardner, 51 N.J. 444, 456 (1968); State v. Riley, 111 N.J. Super. 551, 553 (App.Div. 1970).
The law of the case doctrine applies to the principle that where there is an unreserved decision on a question of law or fact made during the course of litigation, such decision settles that cause for all subsequent stages of that suit. Wilson v. Ohio River Co., 236 F. Supp. 96, 98 (1964). This rule is based upon the sound policy that when an issue is reasonably litigated and decided during the course of a particular case, that decision should be the end of the matter. United States v. U.S. Smelting Refinery and Manufacturing Co., 339 U.S. 186, 198, 70 S.Ct. 537, 544, 94 L.Ed. 750 (1950).
In many cases the appellate court decides a legal question and remands the case to a lower court for further proceedings. The lower court must proceed in accordance with the mandate so established by the appellate court. The lower court "Is without power to do anything which is contrary to either the *293 letter or spirit of the mandate construed in light of the opinion of the court deciding the case." Yablonski v. U.M.W., 454 F.2d 1036, 1038 (D.C. Cir.1971). This doctrine applies to everything that has been decided by a higher court at an earlier stage of the case "either expressly or by necessary implication." City of Cleveland v. Fed. Power Commission, 561 F.2d 344, 346 (D.C. Cir.1977).
New Jersey courts, as well, have adhered to this doctrine. The law of the case doctrine will apply to decisions regarding a question of law or fact made during the course of the same litigation and is applicable and binding upon a trial judge. The purpose of the doctrine is essentially to avoid repetition of litigation of the same issue during the course of a single trial. State v. Powell, 176 N.J. Super. 190, 196 (App.Div. 1980); State v. Hale, 127 N.J. Super. 407, 410-411 (App.Div. 1974). The prior decision is generally applicable and binding upon a trial judge, State v. Powell, supra, 176 N.J. Super. at 195. However, the doctrine remains discretionary and does not operate as a rigid or mechanical rule of law. State v. Hale, supra; Anderson v. Sills, 143 N.J. Super. 432, 440 (Ch.Div. 1976). This discretionary aspect of the doctrine applies in instances where it must be decided whether a ruling made by a trial judge during one stage of the action is binding throughout the litigation. For instance, when new evidence comes into light which was unavailable at the time of the original hearing on the motion through no fault of the movant, the court should not be foreclosed from considering the weight, if any, to be afforded the new evidence. State v. Roccasecca, 130 N.J. Super. 585 (Law Div. 1974), See also R. 4:42-2. It is clear to this court that when an appellate court has made a determination respecting a question of law or fact, that decision is binding upon the trial court in subsequent proceedings in the same case. State v. Hale, supra, 127 N.J. Super. at 410; State v. Cusick, 116 N.J. Super. 482, 485 (App.Div. 1971).
Based on the foregoing, this court finds it is bound by: (1) Judge Coleman's order that plaintiffs' second count must be *294 dismissed because the statute of limitations had run. At Judge Coleman's hearing, plaintiffs stipulated to the fact that they knew in January 1978 of their potential claim against the physicians; (2) the Appellate Division's denial of defendant-Sherman's motion for a stay and consolidation, which is clear to this court that they rejected his statute of limitations theory; (3) the Supreme Court's ruling that the parents' claim was independent from that of the child's and not derivative, that the parents' claim "is, therefore, barred by N.J.S.A. 2A:14-2." Procanik, 97 N.J. at 356.
It is, therefore, this court's opinion that the question of the timeliness of the parents' claim has been settled and that this court is bound by the law of the case.

CONCLUSION
For the reasons expressed herein, Sherman's motion for summary judgment is granted and all cross-claims against him are hereby dismissed. The summary judgment motion brought by Greenstone and Goldsmith is denied. An appropriate order consistent with this opinion shall be submitted.
NOTES
[1] January 29, 1979
 Herbert E. Greenstone, Esq. & Allen Naishuler, Esq.
 Greenstone, Greenstone & Naishuler, Esq.
 744 Broad Street
 Newark, New Jersey 07102

Gentlemen:
We have, in the office, a Procancik file. This is a case in which a woman had a last menstrual period in May, measles at the end of May, then went to a gynecologist at the beginning of June; rubella test done, showed that she did have antibodies to it and apparently never informed of this so as to get an abortion. Gave birth to a deformed child in the following year. This case would fall into the area of Gleitman v. Cosgrove, 227 Atlantic 2d 689. The decision in this case was in 1967, at a time when abortions were still illegal. The decision was 4 to 3, and was, in part, based on the fact that abortions were illegal.
Recently, in New York, (and a copy of this decision is enclosed) there were two cases decided, Becker v. Schwartz and Park v. Jessen [Chessin, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807], which in effect reverses Gleitman v. Cosgrove, and the New York case, Stuart v. Long Island Hospital. I think that now, at this time, it is an appropriate time to determine clearly whether or not we wish to take on Gleitman v. Cosgrove, going up to the Supreme Court. I think the time is right, and I think we have a good shot at reversal. The reason for the memo, then, is please read Becker v. Schwartz which is enclosed as well as Gleitman, so that we can discuss it and discuss our options. The damages are heavy.
 Cordially,
 /s/ Lee
 Lee S. Goldsmith

[2] April 26, 1979
 Harold A. Sherman, Esq.
 Mandel, Wysoker, Sherman, Glassner & Weingartner, P.A.
 313 State Street
 Perth Amboy, New Jersey 08861

Re: Rose Marie Procanik
Dear Harold:
We have finally come to a decision as to what to do with the Procanik case, after a great deal of discussion here in the office because of the problems presented by the case. Let me outline those problems to you as this forms the basis of our turning down this case.
The Procanik case basically falls into the area of a woman who had measles which was not definitively diagnosed, and, at approximately the same time was diagnosed as being pregnant. No steps were taken at that time. We are aware that Mrs. Procanik indicated that had she known of the potential problem, she would have undergone an abortion. We sent out the questions in the form of a possible malpractice case to an obstetrician/gynecologist, who felt that it was an extremely difficult position to put an obstetrician/gynecologist in. We did, however, decide not to leave it there and went ahead and reviewed the following:
1) Gleitman v. Cosgrove, 49 N.J. 22 (1967). As you are probably aware, this case prohibits the kind of action that would have to be brought herein. In other words, that type of action would be either a wrongful birth or an action for the purpose of trying to obtain damages for children who were born, and who would otherwise not have been born. 2) In January, 1979 two cases came down, reported as Nos. 559 and 560 of the Court of Appeals, New York entitled, Becker v. Schwartz and Park v. Chessin. These actions both are similar to Gleitman v. Cosgrove, and in effect, in New York, render a different opinion. It is possible that Gleitman could be reversed and it is further possible that the New Jersey courts could follow Becker v. Schwartz and Park v. Chessin. These cases do allow a person to sue under the circumstances of Procanik, and would allow the possibility of damages for life. It would mean, however, in Procanik, that the case would have to be started, face a dismissal at this level, and then obviously be appealed to the Supreme Court in the hopes of obtaining a reversal of Gleitman v. Cosgrove.
Considering the fact that the expert is somewhat weak on the case and considering the fact that it would have to be taken to the Supreme Court in order to obtain a reversal before a valid case could be brought, we have decided not to proceed. The law is dead against us in the State and the reversal would be necessary.
I am returning herewith all the hospital records that you were kind enough to send us. I will, if you like, send you a copy of the report of the expert. We have checked out every avenue and I think in all probability Mrs. Procanik did have measles, did become pregnant while she had the measles, and was not so informed. But because of the many and sundry other problems, we would not proceed.
Will you please be good enough to inform the Procaniks.
 Cordially,
 /s/ Lee
 LEE S. GOLDSMITH

[3] May 2, 1979
 Mr. & Mrs. Michael Procanik
 17 Chase Avenue
 Avenel, N.J. 07001
 Re: Rose Marie Procanik
 Peter Procanik

Dear Mr. & Mrs. Procanik:
This will confirm that we have had a personal meeting to discuss the letter which I received from Mr. Lee Goldsmith, to whom I had referred the possible mal-practice claims, along with the materials and records collected up to this point.
The sad truth is that while the probabilities are that the facts you relate are true, that under the law of New Jersey as it presently stands, the case would not survive a dismissal at the trial level. For your information, Mr. Goldsmith is not interested in handling the matter, and his judgment is one on which I would certainly rely.
Accordingly, I have returned the materials to you with the caution that you are free to consult another attorney, who after all, might feel differently about the case. You are also advised that, while the infant's claim survives until two years from attaining his 18th birthday, it is advisable to bring these cases within two years after the parents know or should have known that there was a possible mal-practice claim, because the parents' claims for loss of services and medical expenses may be barred within two years, even though the infant's claim for injury might survive, as previously stated. It is also true that witnesses become less available, including doctors, and the same applies to records and other necessary documents.
I would, therefore, suggest that if you want to pursue this further, you contact another attorney immediately. I will provide any such attorney with a copy of Mr. Goldsmith's letter, should that request be made.
You will recall that you advanced us $200.00 towards costs, which were as follows:

 Rahway Hospital Records: $ 54.00
 Presbyterian Hospital Records: 48.00
 Children's Hospital Records: 18.00
 _______
 Total: $120.00

Accordingly, enclosed find our check for $80.00.
 Very truly yours,
 HAROLD A. SHERMAN

[4] Certification will be granted only if the appeal presents a question of general public importance which has not been but should be settled by the Supreme Court or is similar to a question presented on another appeal to the Supreme Court; if the decision under review is in conflict with any other decision of the same or a higher court or calls for an exercise of the Supreme Court's supervision and in other matters if the interest of justice requires. Certification will not be allowed on final judgments of the Appellate Division except for special reasons.
[5] "Practice and procedure include the mode of proceeding and the formal steps by which a legal right is enforced. Those words comprehend writs, summonses and other methods of notice to parties as well as pleadings, rules of evidence and costs. Practice and procedure indicate the forms for enforcing rights as distinguished from the law which creates, defines and protects rights." Duggan v. Ogden, 180 N.E. 301, 302, 278 Mass. 432 (1932). See also 33 Words and Phrases, Practice and Procedure, at 279 (1971); Black's Law Dictionary (5 ed. 1979) at 1055, 1083.