[L.A. No. 32131. July 21, 1986.]

VIRGINIA CASAS, Plaintiff and Appellant, v.
MAX E. THOMPSON, Defendant and Appellant.

**COUNSEL**

E. Stephen Temko for Plaintiff and Appellant.

Daniel B. Hunter, Thomas J. Ryan, Hunter & Ryan, James D. Allen and McDonald & Allen for Defendant and Appellant.

**OPINION**

**LUCAS, J.**—This case presents two issues for review: (1) following enactment of the Federal Uniform Services Former Spouses' Protection Act[1] (FUSFSPA), does a California court have the power to award a former spouse an interest in a military retiree's pension which was omitted from an earlier dissolution decree; and (2) if the court can make such an award, should the division of the pension be based on its "disposable" (as defined in FUSFSPA)[2] amount or its "gross" amount? We conclude that the court has the power to award a former spouse an interest in the "gross" amount of a military retiree's pension.

I

Virginia Casas (Virginia) and Max Thompson (Max) were married October 20, 1949. Max was a commissioned officer in the United States Navy at the time of the marriage. Virginia and Max were married for over 15 years and had five children. The parties separated July 21, 1965; at that time, Max had been on active duty with the Navy for over 21 years.

---

[1] 10 United States Code section 1408. All statutory references are to title 10 of the United States Code unless otherwise specified.

[2] Section 1408(a)(4) states: "'Disposable retired or retainer pay' means the total monthly retired or retainer pay to which a member is entitled (other than the retired pay of a member retired for disability under chapter 61 of this title) less amounts which— [¶] (A) are owed by that member to the United States; [¶] (B) are required by law to be and are deducted from the retired or retainer pay of such member, including fines and forfeitures ordered by courts-martial, Federal employment taxes, and amounts waived in order to receive compensation under title 5 or title 38; [¶] (C) are properly withheld for Federal, State, or local income tax purposes, if the withholding of such amounts is authorized or required by law and to the extent such amounts withheld are not greater than would be authorized if such member claimed all dependents to which he was entitled; [¶] (D) are withheld under section 3402(i) of the Internal Revenue Code of 1954 (26 U.S.C. 3402(i)) if such member presents evidence of a tax obligation which supports such withholding; [¶] (E) are deducted as Government life insurance premiums (not including amounts deducted for supplemental coverage); or [¶] (F) are deducted because of an election under chapter 73 of this title to provide an annuity to a spouse or former spouse to whom payment of a portion of such member's retired or retainer pay is being made pursuant to a court order under this section."

Virginia filed a complaint for divorce in the year that she and Max separated, and an interlocutory judgment of divorce was entered on November 2, 1966. Max's military retirement pension was not mentioned by either party in the divorce pleadings, and the trial court did not consider or rule on the pension when dividing the couple's property. The trial court found that the community property of the parties consisted of stock, household furniture, and an automobile. Max was awarded "all of the community property of the parties."

Max was also awarded custody of four of the children; the fifth child, the eldest, was already married at the time her parents were divorced. The four children continued to live with Max and were supported solely by Max during their minority. One of the children lived with Virginia for a brief period, but Max paid child support to Virginia during that time.

Max retired from the Navy July 1, 1970, after serving over 26 years, and began receiving monthly nondisability retirement pay. On November 5, 1980, Virginia filed a complaint to have an omitted asset, Max's military pension, partitioned. The trial on the partition was held March 22, 1982, and the court ruled from the bench that, pursuant to *McCarty* v. *McCarty* (1981) 453 U.S. 210 [69 L.Ed.2d 589, 101 S.Ct. 2728], Max's pension was his separate property.

Prior to entry of judgment, however, Virginia moved the court to enter a judgment different than announced, based on passage of FUSFSPA. The court reopened the matter and another hearing took place June 15, 1983. This time the trial judge found that FUSFSPA overruled *McCarty* and that Max's retirement pay was a community property asset which was omitted in the earlier divorce proceeding and should now be partitioned. However, the court refused to partition the amount paid to Max from the date of his retirement in July 1970 to November 1980, when Virginia filed her complaint for partition, even though the court made no finding of laches or of unclean hands. Max's attorney had argued the unclean hands defense based on the 1966 judgment which found Virginia to be an "unfit parent," but the court responded that fault and guilt have no place in property division in dissolution proceedings according to current state policy. In spite of finding no unclean hands or laches defenses, the court reasoned that it would be unfair in view of all the facts of this case to require Max to pay Virginia money which he had received and spent over the last 10 years, especially because Virginia had waited until 14 years after her divorce to file for the partition and because Max had been supporting the children during that period. However, because Max was put on notice that the pension was subject to division when Virginia filed her complaint in November 1980, from that time forward the pension was to be divided.

Based on the number of years that Max and Virginia were married during Max's years of military service, Virginia was awarded 30 percent of the *gross* retirement pay for any *future* pension payments received by Max. The trial judge specifically ruled that under FUSFSPA he was not limited to dividing *disposable* retirement income, but instead was allowed to divide *gross* retirement income. As to payments that Max received from November 1980 (when Virginia filed for partition) to June 15, 1983 (the date of the hearing), the court, using its equitable powers, nonetheless ruled that Virginia would receive only 30 percent of the disposable pay received by Max. The court reasoned that Max had already paid taxes on the pay and that using the disposable pay figures would be fair and would avoid an "accounting nightmare."

Both Max and Virginia appealed the trial court's judgment. Max argued that the retirement income should not have been partitioned and, alternatively, that the award for future payments should be based on his *disposable* pay instead of his *gross* pay. Virginia contended that she should not have been denied a percentage of the retirement pay from the retirement date in 1970 to her filing date in 1980. She further argued that she should have been awarded 30 percent of the gross retirement pay that Max received between 1980 and the 1983 hearing date, regardless of the accounting problems such an award might cause.

The Court of Appeal majority upheld the lower court's judgment on all matters except one—the matter of Virginia's award of 30 percent of the disposable pension income Max received between 1980 and 1983. As noted, the trial court's only reason for not awarding a percentage of the gross income was its belief that such an award would cause an "accounting nightmare." The Court of Appeal held that the trial court, having offered no other equitable considerations to support its reasoning, abused its discretion in denying Virginia an award of 30 percent of the gross income for those years.

Both parties filed petitions for review. Max sought review on five grounds: that (1) *McCarty* should be applied retroactively to preclude division of military pensions; (2) military pensions are not vested after 20 years of active duty service; (3) military retirement pay is not community property in California; (4) FUSFSPA precludes division of his military pension because his divorce was final before *McCarty* was decided; and (5) FUSFSPA allows state courts to divide only disposable retirement pay. Virginia sought review of the Court of Appeal's refusal to award her a share of Max's pension benefits received before she filed for partition in 1980.

After carefully considering the matter, we have determined that the thoughtful opinion of Justice Work for the Court of Appeal, Fourth Appellate

District, in this case correctly treats the issues, and that (with appropriate deletions and additions)* we should adopt it as our own opinion. The Court of Appeal opinion, as modified, is as follows:

## II

[] Virginia seeks to partition an asset, Max's military pension, omitted and unadjudicated in the 1966 divorce. ■ *Henn* v. *Henn* (1980) 26 Cal.3d 323 [161 Cal.Rptr. 502, 605 P.2d 10], permits Virginia to bring an independent action to partition such an omitted asset if she had a divisible interest in it at the time of the 1966 divorce. (*Shaver* v. *Shaver* (1980) 107 Cal.App.3d 788, 794 [165 Cal.Rptr. 672].) ■ Unless Virginia had such an interest in 1966, she cannot prevail because under California law whether the asset is separate or community is established as of the time the asset is acquired. (*Henn, supra,* 26 Cal.3d at p. 330.) That interest is not altered except by judicial decree or the parties' agreement. (*Ibid.*) Thus, Virginia contends her community property interest attached to the pension before the divorce. Because this asset was not before the court in 1966, her interest was not altered by that judgment. If the asset was a community property asset, Virginia's unadjudicated rights continued in the form of a tenancy in common with Max. (*Ibid.*) However, if Virginia had no community property interest in Max's pension in 1966, there is nothing to partition now, and Virginia cannot prevail.

Until *In re Marriage of Fithian* (1974) 10 Cal.3d 592 [111 Cal.Rptr. 369, 517 P.2d 449], the California view regarding the characterization of vested military retirement pensions as community or separate property was unsettled. (See *Aloy* v. *Mash* (1985) 38 Cal.3d 413, 416 [212 Cal.Rptr. 162, 692 P.2d 656].) After 1974, California courts uniformly held vested military pensions were community property. However, in *McCarty* v. *McCarty, supra,* 453 U.S. 210, the United States Supreme Court held the federal legislative scheme authorizing military pensions impliedly preempted state community property law and prohibited the division of military retirement pay. Reacting to *McCarty,* Congress amended these statutes by adding section 1408, FUSFSPA, to title 10 of the United States Code. ■ The compilation of FUSFSPA's legislative history shows Congress's express intent was to remove the effect of *McCarty* by permitting state courts to apply their marital property laws to military retired pay when fixing the parties' property rights in a divorce, consistent with the application of "*such laws to the retired pay of Federal Civil servants, Foreign Service personnel*

---

*Brackets together, in this manner [ ], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. (*Estate of McDill* (1975) 14 Cal.3d 831, 834 [122 Cal.Rptr. 754, 537 P.2d 874].)

*and private sector employees."* (Sen.Rep. No. 97-502, 2d Sess., p. 1 (1982); 1982 U.S. Code Cong. & Admin. News, p. 1596, italics added.) Consistent with an express intent to erase *McCarty*'s impact on all cases, FUSFSPA's provisions were made retroactive to the day before that decision was filed. (*In re Marriage of Sarles* (1983) 143 Cal.App.3d 24, 26-29 [191 Cal.Rptr. 514].)

■ Based on these events, Max contends any award to Virginia is improper because *McCarty* declares that in 1966 Virginia did not have a community property interest in the military pension. He argues that under *McCarty*, the divorce court in 1966 lacked jurisdiction to so divide the asset. Because *McCarty* is not properly construed as acting retroactively, we disagree.

■ Whether and to what extent an overruling case will be applied retroactively depends on all circumstances of the particular overruling decision involved.[3] (*Linkletter* v. *Walker, supra,* 381 U.S. 618, 629 [14 L.Ed.2d 601, 608].) In *Chevron Oil Co.* v. *Huson* (1971) 404 U.S. 97 [30 L.Ed.2d 296, 92 S.Ct. 349], the United States Supreme Court identified three relevant factors: Whether (1) the decision establishes a "new principle of law" by overruling "clear and past precedent"; (2) the history and purpose of the rule announced require retroactive application; and (3) retroactively applying the overruling decision would produce injustice or hardship. (*Id.,* at pp. 106-107 [30 L.Ed.2d at p. 306].)

■ [The Court of Appeal] examined these factors in light of *McCarty* in *In re Marriage of Sheldon* (1981) 124 Cal.App.3d 371, 375 [177 Cal.Rptr. 380], and held *McCarty* not retroactive in the context of a direct appeal

---

[3]The problem arises because of a fundamental split in legal philosophy. Blackstone believed that judges do not "create," but instead "find" the law. A decision interpreting the law, therefore, does no more than declare what the law had always been. An overruling decision, under this theory, also does no more than declare the law—albeit in a more enlightened manner. From this declaratory nature of a judicial decision, the following rule emerges: An overruled decision is only a failure at true discovery and was consequently never the law; while the overruling one was not "new" law but an application of what is, and had been, the "true" law. (*Linkletter* v. *Walker* (1965) 381 U.S. 618, 623 [14 L.Ed.2d 601, 605, 85 S.Ct. 1731].) Here, implicitly recognizing this theory, Max argues *McCarty* declares what always was, and particularly what was the law in 1966. He contends under the retroactive application of *McCarty*, Virginia did not have a community property interest in his military pension at the divorce. Thus, he concludes she can take nothing by her action to partition.

However, "[w]hatever doubts of a philosophical nature may remain, the law is nevertheless clear: a state court has power to give an overruling decision prospective application only, and to deny it any retroactive effect." (*Collins* v. *Webb* (N.D.Cal. 1955) 133 F.Supp. 877, 879.) This principle derives from the view that judges make law rather than declare the law. Adherents to this view state that a decision of a state's highest court, though later overruled, is law nonetheless for intermediate transactions. (See *Linkletter, supra,* at p. 625 [14 L.Ed.2d at p. 606].)

from an interlocutory judgment. As to the first two *Huson* factors, we view [the] *Sheldon* analysis as applicable although we deal here with an independent action to partition a community asset omitted at the time of the parties' 1966 divorce. (See *In re Marriage of Sheldon, supra,* 124 Cal.App.3d at pp. 377-379.) As to the third *Huson* factor, [the] reasoning in *Sheldon* pointed to the need for "stability and finality" as outweighing the benefits to be gained by reopening a final property division. (*Sheldon, supra,* at pp. 379-380.) *Henn* implicitly holds, however, that the policy favoring equitable division of marital property outweighs that of stability and finality in the limited context of omitted assets. Moreover, the partition action here is an equitable one, permitting the court to consider any unjust or harsh result in making its award. (*Hill* v. *Hattrem* (1981) 117 Cal.App.3d 569, 574 [172 Cal.Rptr. 806].) Thus, we conclude *McCarty* should not be given retroactive effect. "[T]he fact is that no case within our memory has received less retroactive application than *McCarty* . . . . [F]or most purposes, *McCarty* not only is not the law but never really was." (*Aloy* v. *Mash, supra,* 38 Cal.3d at pp. 421-422, fn. omitted.)

*Henn* authorizes an independent action to partition omitted pensions only if the nonemployee spouse had a divisible interest in the asset at the time of the original decree. Thus, we are left with the question whether Virginia had such an interest in 1966. We conclude she did. In *Fithian,* [we] held vested military pensions are community property. Although the parties' divorce occurred before that decision, *Fithian* is given "full retroactive effect" under *Henn* v. *Henn, supra,* 26 Cal.3d 323, 328-329. (See *Shaver, supra,* 107 Cal.App.3d at p. 794.) In *Henn,* [we] stated as the general rule that *overruling* decisions are retroactive. There, [we] noted *Fithian* did not overturn a settled rule of law and applied *Fithian* retroactively to a 1971 dissolution. The preliminary finding necessary to support a determination of *non*retroactivity is that the decision must establish a new principle of law by overruling clear past precedent or by deciding an issue of first impression whose resolution was not clearly foreshadowed. (*Hurvich* v. *Califano* (D.C. Cal. 1978) 457 F.Supp. 760, 762, interpreting *Chevron Oil* v. *Huson, supra,* 404 U.S. 97, test for retroactivity.) Thus, applying the same United States Supreme Court test for retroactivity to *McCarty* and *Fithian* gives different results: *McCarty,* which overruled clear California law and whose purpose would not be effectuated by retroactive application is deemed prospective. **(6)** (See fn. 4.), **(4c)** Conversely, *Fithian* did not overturn a settled rule of law and its purposes are achieved by retroactive application.[4]

---

[4]Max also argues that FUSFSPA, effective February 1, 1983, cannot be constitutionally applied to cases (his 1966 divorce) decided before its effective date. He contends to retroactively apply FUSFSPA violates the principle of separation of powers as a legislative attempt to annul *McCarty.* Max misconceives the nature of Virginia's action here. The pension was not before the court in 1966; Virginia's interest was not altered by that decree. This is

██ ██ ██ ██ ██ Accordingly, we conclude the [trial] court properly applied *Henn* and its progeny, awarding Virginia her one-half community property interest in Max's vested military pension.[5] Under the circumstances present here, res judicata and collateral estoppel do not bar Virginia's new action to determine her interest in the pension. (See *In re Marriage of Davis* (1980) 113 Cal.App.3d 485, 488 [169 Cal.Rptr. 863].)

██ [Max contends that section 1006(b)[6] prohibits any partition of a military pension if the judgment of divorce or dissolution became final before June 26, 1981, the date of the decision in *McCarty*. However, section 1006(b) does not refer to *entitlement* to property division, but rather to the mechanics of making direct pension payments to former spouses who have a community property interest in the pension. In discussing section 1006(b), the court in *In re Marriage of Hopkins* (1983) 142 Cal.App.3d 350, 360 [191 Cal.Rptr. 70], observed that the section "appear[s] to be of a mechanical nature only in determining the manner of payment, not the question of entitlement to payment." Section 1006(b) may prohibit a former spouse from receiving direct pension payments based on modification of a judgment

---

an independent action to divide an omitted asset; Virginia does not and cannot seek to modify or reopen the 1966 judgment. (*In re Marriage of Cobb* (1977) 68 Cal.App.3d 855, 860, fn. 1 [137 Cal.Rptr. 670].) In any event, as we shall explain, Virginia's partition action requires an application of FUSFSPA only to the extent FUSFSPA expressly or impliedly preempts California community property laws, which it does only to a limited extent not relevant to the issues posed by this case.

[5]Max incorrectly contends on a variety of theories that his pension was not "vested" at the time of the 1966 divorce. Not only did Max stipulate at trial that the pension was vested, but the facts as conceded in his opening brief establish vesting as a matter of law. At the time of the divorce, Max had more than 21 years' active service and could have applied for retirement. A military pension vests when the service member completes the required number of years of service and is eligible for a pension. (*Bensing* v. *Bensing* (1972) 25 Cal.App.3d 889, 892 [102 Cal.Rptr. 255], cited as a vested pension in *In re Marriage of Brown* (1976) 15 Cal.3d 838, 842 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164]; see also *Ruchti* v. *Goldfein* (1980) 113 Cal.App.3d 928, 931, fn. 1 [170 Cal.Rptr. 375]; *Aloy* v. *Mash, supra,* 38 Cal.3d at p. 415, fn. 1.) Moreover, the fact that Max could lose his retirement pay if court-martialed does not make the pension nonvested; rather, it is simply vested "subject to divestment." (*In re Marriage of Brown, supra,* 15 Cal.3d at p. 842, fn. 2.)

On a similar note, Max also asserts that division of his military retirement pay is prohibited, because it is reduced compensation for reduced current services and, to the extent earned after his separation from Virginia, is not community property. However, in *In re Marriage of Fithian, supra,* 10 Cal.3d at page 604, we held "military retirement pay must be realistically viewed as compensation for past, not present, services." The Supreme Court in *McCarty* did not overrule *Fithian*'s characterization of military retired pay as deferred compensation. (See *McCarty* v. *McCarty, supra,* 453 U.S. at p. 223 [69 L.Ed.2d at p. 600].)

[6]"Subsection (d) of section 1408 of Title 10, United States Code, as added by section 1002(a) shall apply only with respect to payments of retired or retainer pay for periods beginning on or after the effective date of this title, but without regard to the date of any court order. However, in the case of a court order that became final before June 26, 1981, payments under such subsection may only be made in accordance with such order as in effect on such date and without regard to any subsequent modifications."

which was entered before June 26, 1981, but the section does not prohibit the modification itself.]

## III

■ Assuming we reject his other arguments, Max relies on section 1408(a)(4) and (c)(1) to argue that California can only declare a community property interest in a portion of his retirement pay; that part which is defined as "disposable."[7] In essence, the "disposable" retirement pay is the gross pay less statutorily specified deductions which, except for the retiree's individual withholding tax liability, are under the direct or indirect control of the retiree, and will significantly vary among retirees with the same gross retirement pay. Max contends California is precluded from awarding an ex-spouse more than the community property interest (one-half) in a retiree's disposable retirement pay.

We find Max's proposition illogical. Applying his theory, former spouses whose community property interests were acquired over exactly the same time period, whose military retiree spouses receive exactly the same gross retirement benefits, are subject to receiving different sums if, for example, their respective spouses are in different tax brackets,[8] or if one understates

---

[7] Section 1408(a)(4) states: "'Disposable retired or retainer pay' means the total monthly retired or retainer pay to which a member is entitled (other than the retired pay of a member retired for disability under chapter 61 of this title) less amounts which— [¶] (A) are owed by that member to the United States; [¶] (B) are required by law to be and are deducted from the retired or retainer pay of such member, including fines and forfeitures ordered by courts-martial, Federal employment taxes, and amounts waived in order to receive compensation under title 5 or title 38; [¶] (C) are properly withheld for Federal, State, or local income tax purposes, if the withholding of such amounts is authorized or required by law and to the extent such amounts withheld are not greater than would be authorized if such member claimed all dependents to which he was entitled; [¶] (D) are withheld under section 3402(i) of the Internal Revenue Code of 1954 (26 U.S.C. § 3402(i)) if such member presents evidence of a tax obligation which supports such withholding; [¶] (E) are deducted as Government life insurance premiums (not including amounts deducted for supplemental coverage); or [¶] (F) are deducted because of an election under chapter 73 of this title to provide an annuity to a spouse or former spouse to whom payment of a portion of such member's retired or retainer pay is being made pursuant to a court order under this section."

Section 1408(c)(1) states: "Subject to the limitations of this section, a court may treat disposable retired or retainer pay . . . as property of the member and his spouse in accordance with the law of the jurisdiction of such court."

[8] For example, consider the situations of two divorced military retirees, identical in every respect except one has no source of income other than the pension while the other has significant additional income. In our progressive tax system, the effective tax rates for these two persons will significantly vary, because the rates are a function of total taxable income. As to the retiree with additional taxable income, he has the ability to have a greater percentage of his pension payments withheld upon application than is directly attributable to his gross retirement pay. (See Comp. Gen. (1984) § B-213895, pp. 322-331.) This, in turn, will reduce his "disposable pay" and accordingly (under Max's argument), the amount of the pension subject to division by the court as community property. Under such a theory, the

his dependents, or if one commits torts against the government or incurs other indebtedness to it for which the ex-spouse bears no liability. We can conceive of no legitimate governmental interest, nor has Max suggested any, which would rationally support such disparate treatment.[9]

## IV

Max does not suggest there is logic in his position, nor that disparate treatment will not occur. He argues that FUSFSPA, while it overruled *McCarty,* only grants the states a limited waiver of the preemption *McCarty* found implicit in the preexisting statutes.

Max's proposition flows from a flawed premise. He views *McCarty's* holding of preemption as an immutable given, believing any power which the states now possess to characterize military pensions as community property must derive from an express authorization in FUSFSPA. His approach is similar to that expressed in *In re Marriage of Costo* (1984) 156 Cal.App.3d 781, 786 [203 Cal.Rptr. 85], where the reviewing court merely looked to the face of section 1408 and determined Congress did not *give* California the unlimited right to treat military retirement pay according to its laws.

His argument is founded on a misunderstanding of the holding in *McCarty, supra,* 453 U.S. 210. The Supreme Court in *McCarty* addressed the question of *implied* preemption. Finding no express statement by Congress that state community property laws were preempted in regard to military pensions (see *id.,* at pp. 236-237 [69 L.Ed.2d at pp. 608-609] [dis. opn.]), the court instead considered a variety of circumstantial evidence, including related statutory schemes and the objectives of the military retirement system, in determining application of state community property laws to military pensions would do such "major damage" to "clear and substantial" federal interests as to require a finding of implied preemption under the supremacy

community property interests of the two ex-spouses in two pensions of identical amounts would differ.

To compound the inequity, assume further the retiree with additional income was entitled to claim substantial deductions in a given tax year resulting in no tax liability. On filing his return, the retiree would receive a tax refund of all monies previously withheld from his pension payments. Yet, under Max's theory, there is no way his ex-spouse could assert a community interest in the refund, to which she would have been entitled had there been no withholding.

[9]We have serious concerns Max's theory renders FUSFSPA unconstitutional on equal protection grounds. Our obligation to interpret statutes harmoniously with the Constitution (*California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193]) is another reason for our interpreting FUSFSPA to avoid Max's proffered irrationality.

clause. (See *id.*, at p. 220 [69 L.Ed.2d at p. 598]; *Hisquierdo* v. *Hisquierdo* (1979) 439 U.S. 572, 581 [59 L.Ed.2d 1, 10, 99 S.Ct. 802].)

The *McCarty* holding of implied preemption is thus a contextual one, taking into account all relevant facts and circumstances. Those facts and circumstances have now changed by reason of Congress's enactment of FUSFSPA. Accordingly, the question we must address here is not whether FUSFSPA expressly grants to the states the power to divide the gross amount of military pensions, but whether under the present federal scheme there remains a conflict between the federal retirement statutes and California community property rights threatening clear and substantial federal interests with grave harm. Stated differently, were *McCarty* to be decided after FUSFSPA, would the Supreme Court imply preemption?

 We note a basic proposition: "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states and not to the laws of the United States." (*Ex Parte Burrus* (1890) 136 U.S. 586, 593-594 [34 L.Ed. 500, 503, 10 S.Ct. 850].) That Congress was aware of this principle and intended that state laws apply to the characterization of military pensions as community property is made abundantly clear by the legislative history surrounding the enactment of FUSFSPA.

Senate Report No. 97-502 expressly details the legislative intent and purpose underlying FUSFSPA. For instance, its stated primary purpose "is to remove the effect of the United States Supreme Court decision in *McCarty* v. *McCarty*, 453 U.S. 210[, *supra*,] ... . by permitting . . . courts, consistent with the appropriate laws, to once again consider military retired pay when fixing the property rights between the parties to a divorce, dissolution, annulment or legal separation . . . ." (Sen. Rep. No. 97-502, *supra*, p. 1; 1982 U.S. Code Cong. & Admin. News, p. 1596.)

Any doubt as to the intended scope of the foregoing sweeping language is dispelled at page 5 of the report; 1982 United States Code Congressional and Administrative News, page 1599: "[T]he committee intends the legislation to *restore the law to what it was* when the courts were permitted to apply State divorce laws to military retired pay." (Italics added.) Thus, it is clear FUSFSPA's primary purpose is to remove obstacles the state courts may encounter in applying their divorce laws to military retired pay as those laws were being applied before the decision in *McCarty* v. *McCarty*, and as if that decision never existed. Pre-*McCarty* California decisions treated military retirement benefits like all other community property, dividing the

total (gross) benefits.[10] (See *In re Marriage of Fithian, supra,* 10 Cal.3d at pp. 595, 604.)

Not only does the legislative history of FUSFSPA document Congress's understanding that state laws characterizing military pensions as community property would apply in the same way as they did before *McCarty,* but even the *McCarty* analysis, applied after the enactment of FUSFSPA, would yield the conclusion there is no longer any implicit conflict between state laws and the federal scheme.

The grave harm to "clear and substantial" federal interests found in *McCarty* was premised on the belief "Congress has enacted a military retirement system designed to accomplish two major goals: to provide for the retired service member, and to meet the personnel management needs of the active military forces. The community property division of retired pay has the potential to frustrate each of these objectives." (*McCarty* v. *McCarty, supra,* 453 U.S. at pp. 232-233 [69 L.Ed.2d at p. 606].)

*McCarty* first reasoned that any community property division of retired pay could disrupt the carefully balanced scheme Congress had devised to encourage service members to set aside a portion of their retired pay as an annuity for surviving spouses or dependent children. (*McCarty* v. *McCarty, supra,* 453 U.S. at p. 233 [69 L.Ed.2d at p. 606].) The United States Supreme Court speculated that by diminishing the amount available to the retiree, a community property division would make it less likely the retired service member would choose to reduce his or her retired pay still further by purchasing such an annuity. Now, by defining disposable pay in FUSFSPA to exclude all annuity disbursements for beneficiaries other than the ex-spouse, Congress must be deemed to have expressly rejected this concern for disruption.

Second, *McCarty* suggests community property interests "'diminish that portion of the benefit Congress had said should go to the retired [service member] alone.'" (*McCarty* v. *McCarty, supra,* 453 U.S. at p. 233 [69 L.Ed.2d at p. 606].) This thought is based on language in *Hisquierdo, supra,* 439 U.S. at page 590 [59 L.Ed.2d at page 16], a case involving the Railroad Retirement Act which, unlike FUSFSPA, expressly states "not

---

[10]In a post-*McCarty* decision, [the Court of Appeal] rejected the identical argument Max pursues, finding the divisible community property interest is in the total military retirement benefits earned during the course of the marriage, *and not in a reduced sum derived by treating the disposable retired pay as the only part which may be treated as a community property asset.* Although [the] treatment of this issue in *In re Marriage of Scott* (1984) 156 Cal.App.3d 251 [202 Cal.Rptr. 716], was recognizably summary, an alternative result is inconsistent with the express congressional intent to restore the state court's ability to apply the law to military retired pay *as it was applied pre-McCarty.*

withstanding any other law of the United States or of any State . . . no annuity or supplemental annuity shall be assignable or be subject to any tax or garnishment, attachment, or other legal process under any circumstances whatsoever, nor shall the payment thereof be anticipated." (45 U.S.C. § 231m.) (As the court noted in *Hisquierdo,* Congress had expressly granted a separate spouse's benefit which terminated upon absolute divorce.) Conversely, FUSFSPA specifically allows garnishment under the same conditions to which garnishments of active military duty pay have always been subject. (See discussion, *infra.*)

Third, the *McCarty* majority found the value of retired pay to induce enlistment or reenlistment is diminished to the extent the service member recognizes he or she may be involuntarily transferred to a state which would divide that pay upon divorce. It found a direct "interference with the goals of encouraging orderly promotion and a youthful military . . . ." (*McCarty v. McCarty, supra,* 453 U.S. at p. 235 [69 L.Ed.2d at p. 607].) On the contrary, by enacting FUSFSPA, Congress is expressly stating the extent of that interference is not found to be sufficient to preclude the states from applying their community property/family laws to military retired pay.[11]

Thus, each of *McCarty*'s factual predicates for finding implied preemption disappeared when FUSFSPA was enacted. Max cites no other adverse impact, substantial or otherwise, on congressional military goals to justify a finding the supremacy clause demands subordination of state laws solely because they would treat gross military retirement pay as community property.

## V

Even if the present federal statutory scheme governing military retirement does not impliedly preempt, in a general sense, the application of California community property laws in total, it remains to be determined whether any specific provision of FUSFSPA expressly requires a limited change in pre-*McCarty* California practice. We have concluded it is unnecessary to find an express *authorization* in FUSFSPA for California courts to divide the "gross" amount of a military retiree's pay. However, we now address Max's argument [that] FUSFSPA expressly *prohibits* state courts from dividing more than the retiree's "disposable" pay. In support of his contention he relies on section 1408(c)(1): "Subject to the limitations of this section, a court may treat *disposable* retired or retainer pay . . . as

---

[11]This basis for *McCarty*'s holding was disputed by contrary findings of the Senate Committee. (Sen. Rep. No. 97-502, *supra,* pp. 7-8; 1982 U.S. Code Cong. & Admin. News, pp. 1602-1603.)

property of the member and his spouse in accordance with the law of the jurisdiction of such court." (Italics added.)

[] Max [] would define the word "treat" in section 1408(c)(1), as meaning "characterize." Under this theory, Congress has prohibited the states from characterizing more than disposable pay as community property. The flaw in such an analysis is manifest when the nature of "property" rights is compared with the concept of "disposable" income. A military pension is characterized as marital property to the extent acquired during the marriage because it is viewed as deferred compensation. (See *In re Marriage of Fithian, supra,* 10 Cal.3d 592, 596.) That compensation was earned by the community during the marriage and, once the pension vests, becomes the "property" of the community in the generic sense. The concept of "disposable" pay or income has nothing to do with the characterization of an asset. The amount of retired pay which is "disposable" will change, perhaps yearly or even monthly. This inevitable periodic variance does not change the nature or value of the pension asset which was previously acquired by the community. Were the rule otherwise, the value of the community asset could never be determined at a time in advance of actual payment, i.e., the time of the divorce. (See *In re Marriage of Emmett* (1980) 109 Cal.App.3d 753 [169 Cal.Rptr. 473], applying the general rule that a military pension should be valued at the time of the divorce and awarded to the retiree, with the nonservice member spouse being compensated with other community assets.) The pension would not be the "property" of the community but would instead be transmuted into a changeable support payment to the nonservice member spouse.

We read section 1408(c)(1) as being aimed at an entirely different proposition. Direct payments were not available to ex-spouses for judgments awarding marital property interests against military retirement pay before the enactment of FUSFSPA. Section 1408 is primarily devoted to establishing a scheme to permit the ex-spouse to "garnish" retirement pay and, at the same time, to afford the military retiree similar protections previously given other retired federal employees by limiting the amount of funds subject to garnishment.[12] (See 22 U.S.C. § 4044 et seq., but compare 5 U.S.C. § 8345(j).) Thus, only "disposable" pay is garnishable. (See 42 U.S.C. § 659, amended in 1975 to permit direct enforcement of court orders for child support and alimony from the net (disposable) retired pay of present

---

[12]"The Act does not limit the total amount of a service member's indebtedness but rather *limits collecting indebtedness from the service member's retired pay.* In this regard, the Act *essentially* does no more than most garnishment laws in establishing a collection ceiling. The clear intent of the Act is to protect retired members from financial deprivation." (Hauserman & Fethke, *Military Pensions as Divisible Assets: The Uniformed Services Former Spouses' Protection Act* (1984) 11 J. Legis. 27, 37, italics added.)

or former federal employees, including members of the armed services.) By a 1977 amendment to 15 United States Code section 1673(b), Congress specifically limited garnishments to a percentage of *disposable earnings*. Under these federal garnishment statutes, the disposable earnings limitation does not affect the size of the retiree's legal obligation to the ex-spouse, but only places limitations on monies that can be directly collected from the government employer in a pay period. (See *Evans* v. *Evans* (W.D. Okla. 1976) 429 F.Supp. 580.)

That FUSFSPA is primarily concerned with the garnishment of military retired pay is further revealed in its statutory title: *Payment of retired and retainer pay in compliance with court orders*. Given this focus, the provisions of section 1408 define the manner and extent to which a state court can order the service secretary to direct the military retiree's pay. Section 1408(a)(2) identifies the class of court orders to which FUSFSPA applies as those specifically providing for the payment of an amount from the disposable retired or retainer pay of a retiree, this amount being expressed in dollars or as a percentage of the disposable pay. (§ 1408(a)(2)(C).) These need not, and normally would not, be judgments or decrees, but garnishments or other court orders issued to enforce awards in judgments or decrees. After service of a court order providing for payment from the retired pay, the service secretary is limited to complying with the order by diverting funds only from the retiree's disposable pay. (§ 1408(d)(1).) This is without regard to whether the judgment underlying the served court order was for child support, alimony, attorney fees or to satisfy a division of community property. (§ 1408(a)(2).) Further, the service secretary typically may not pay out more than 50 percent of the disposable pay to satisfy the obligations to be enforced by the court order. (§ 1408(e)(1).)

Significantly, Congress recognized the 50 percent cap placed upon the service secretary's authority to comply with court orders could leave portions of a retiree's obligations for community property divisions unsatisfied. The Senate Report emphasizes: "Moreover, [FUSFSPA] makes it clear that the mere attainment of that [50 percent] ceiling *in no way absolves the former member of still outstanding legal obligations for* alimony, child support or *other payments*. Any such unsatisfied obligation may be enforced by any means available under law . . . ." (Sen. Rep. No. 97-502, *supra*, p. 11; 1982 U.S. Code Cong. & Admin. News, p. 1606, italics added.) To this end, section 1408(d)(5) provides: "If a court order . . . provides for a division . . . of community property . . . in addition to an amount of disposable retired or retainer pay, the Secretary concerned shall . . . pay . . . [any amount payable to the former spouse from the retiree's disposable pay]." Section 1408(e)(6) further provides: "Nothing in this section shall be construed to relieve a member of liability for the payment of alimony,

child support, or other payments required by a court order on the grounds that payments made out of disposable retired or retainer pay under this section have been made in the maximum amount permitted under paragraph (1) or subparagraph (B) of paragraph (4). *Any such unsatisfied obligation of a member may be enforced by any means available under law* other than the means provided under this section in any case in which the maximum amount permitted under paragraph (1) has been paid and under section 459 of the Social Security Act (42 U.S.C. 659) in any case in which the maximum amount permitted under subparagraph (B) of paragraph (4) has been paid." (Italics added.) Congress thus expressly anticipated court orders would reflect obligations from community property divisions in excess of disposable pay (§ 1408(d)(5)) and emphasized the limitations on the service secretary's ability to reach the retiree's gross pay was not to be deemed a limitation on the state court's ability to define the community property interests at the time of dissolution. (§ 1408(e)(6).)

Max disputes the interpretation of section 1408(c)(1) as merely relating to enforcement of court orders. He refers to language in House of Representatives Report No. 749, 97th Congress, Second Session (1982) page 165 (1982 U.S. Code Cong. & Admin. News, p. 1570), suggesting the preliminary house version of the legislation, similar to that finally enacted in FUSFSPA, "would permit *disposable* military retired pay to be considered as property in divorce settlements under certain specified conditions." (Italics added.)

Page 4 of Senate Report No. 97-502 (1982 U.S. Code Cong. & Admin. News, p. 1598), however, differs from the preliminary language in the House Report cited by Max. It declares the states' ability to create community property interests extends to "the military retired pay," not to disposable retired or retainer pay. The report states that after FUSFSPA marital assets would again be treated according to divorce and property laws of the respective states, subject only to the express limitations imposed by FUSFSPA. (*Ibid.*) Only three such limitations have been identified,[13] and they apply solely to the enforcement of court orders through direct payments by the appropriate service secretary to the ex-spouse.

---

[13]Senate Report No. 97-502, *supra*, page 4 (1982 U.S. Code Cong. & Admin. News, p. 1599) states: "S. 1814 imposes three distinct limits on the division or enforcement of court orders against military retired pay in divorce cases. First, the total amount of the disposable retired or retainer pay of a member which the Service Secretary could pay out to satisfy a court order for prospective obligations could not exceed 50 percent of such pay. Second, this bill would not create in the spouse or former spouse any right, title or interest which could be sold, assigned, transferred or disposed of by will or inheritance. Third, the courts could not direct that a *service member retire at a particular time in order to effectuate any payment out of retired pay to a spouse or former spouse* . . . ." (See also Horkovich, *Uniformed Services Former Spouses' Protection Act: Congress' Answer to McCarty v. McCarty Goes Beyond the Fundamental Question* (1982) Air Force L.Rev. 287, 298-299.)

In sum, considering its intent and operation, we find FUSFSPA is not inconsistent with a division of gross, rather than disposable, military retired pay. FUSFSPA's intended limitations reach only restrictions on the garnishment of and direct payment from the retiree's disposable pay. Characterization of retirement pay remains a state law question. Thus, in California the military retiree's gross pay is a community asset subject to equal division.[14]

## VI

■■■ Virginia seeks her share of the military pension payments Max received from July 1970 (date Max retired) to November 5, 1980 (date Virginia brought the partition action). Although the [trial] court found against Max's defense of laches, the court denied Virginia this retroactive award, stating it would be unfair in light of "all the facts," particularly Max's almost total custody and support of the parties' children during this period.[15] Asserting Max's failure to prove an equitable defense (laches) precludes the court from totally denying her these past payments, Virginia contends the court should have awarded her the one-half community interest from July 1970.

Although [] in *Henn* v. *Henn, supra,* [we] determined omitted military pensions may be later divided in a partition action, [we] left open the recovery of pension payments already made. (*Henn* v. *Henn, supra,* 26 Cal.3d at pp. 332-333.) [We] declared the enforcement of the wife's right in the pension payments received since the initial adjudication does not present any danger of unjust enrichment because the husband "may seek to limit retrospective enforcement . . . on an equitable estoppel theory by demonstrating that she in fact received additional support payments in lieu of a share in the pension. [Citation.]" (*Id.,* at p. 332, fn. omitted.) Noting it may be substantially more burdensome for the husband to account for the pension payments he had received since the initial property division than to comply with a partition effected at that time, [we] stated that that problem could be "adequately addressed under the defense of laches." (*Id.,* at pp. 332-333.)[16] Here, the [trial] court found against Max's claim of laches; Max does not contend the court erred in this respect.

---

[14]Applying its own marital property laws, the Minnesota Court of Appeals reached, without lengthy discussion, a similar conclusion in *Deliduka* v. *Deliduka* (Minn. App. 1984) 347 N.W.2d 52. [The Supreme Court of North Dakota has also noted that FUSFSPA does not prohibit a distribution to a former spouse of more than 50 percent of the disposable retirement pay. (*Bullock* v. *Bullock* (N.D. 1984) 354 N.W.2d 904, 909, fn. 2.)]

[15]The court assumed Virginia would have been required to pay child support had Max been ordered to pay part of his pension to Virginia during this period.

[16][We] explained: "The exercise of a court's authority to so limit equitable relief will provide litigants with an additional incentive to assert all tenable community property rights in assets known to exist at the time of the initial judicial distribution of the marital community." (*Henn* v. *Henn, supra,* 26 Cal.3d at p. 333.)

■ *Henn* instructs the trial court to apply equitable principles in determining whether to enforce by restitution a spouse's community property interest in pension payments received by the retiree spouse before partition and to what degree. (Cf. *Hill* v. *Hattrem, supra,* 117 Cal.App.3d 569, 574.) Where the court finds no unjust result in awarding full retroactive benefits, the court may "tailor the form of that award" to avoid placing an undue burden on the spouse ordered to pay. (*Id.,* at p. 575.)

■ Virginia argues the court may only consider "equitable defenses" such as waiver, estoppel and laches in deciding whether to award retroactive payments. She contends under *Henn* and *Hill* the court must grant such benefits if the earning spouse fails to prove such an equitable defense. Absent such a defense, Virginia argues the court may only tailor the *form* of the award (for example, monthly payments), but not the award itself.

We do not read the cases so narrowly. In *Hill,* the court identifies estoppel and "due process" as considerations in granting this "equitable relief." (*Hill* v. *Hattrem, supra,* 117 Cal.App.3d 569, 574.) Due process is not the type of standard "equitable defense" Virginia contends the court is limited to. Instead, it shows the concern with hardship and fairness *Henn* demands. The *Hill* court explains that "these principles may be relevant due to the potential hardship and unfairness of [the] result in this case involving litigation of newly discovered rights when substantial reliance may have been placed upon previous law." (*Ibid.*) Accordingly, the court stressed that on remand "it is incumbent upon [Husband] to present extrinsic evidence to the trial court of any inequities that may follow in restoring to [Wife] the full amount of her community share in the retirement benefits received to date . . . ." Thus, in determining whether to award these retroactive benefits, the court may consider any facts relevant to the fairness of such payments. Contrary to Virginia's assertion, the court here was not limited to tailoring the form of an award upon finding no laches. Rather, the court must apply "equitable principles," both defenses and general considerations, to determine whether to enforce her community share in the retirement benefits received, whether whole or in part, and then determine whether "tailoring" is appropriate.

The [trial] court here found it would be inequitable to force Max to compensate Virginia for her past community share after he provided the sole support for their five children during their minority (except for one child during a limited time). Moreover, Virginia was not required to make any financial contribution to support four of the children and, during the period she had custody of one child, Max provided support. On this record, the court did not abuse its discretion. [End of Court of Appeal opinion.]

## VII

In conclusion, the Court of Appeal was correct in holding that following enactment of FUSFSPA, a California court has the power to award a former spouse an interest in the *gross* amount of a military retiree's pension which was omitted from an earlier dissolution decree. Thus, Virginia was correctly awarded 30 percent of the gross amount of Max's military pension, beginning in 1980 when she filed the complaint for partition.

The judgment of the Court of Appeal is affirmed.

Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., Grodin, J., and Panelli, J., concurred.