[No. E002245. Fourth Dist., Div. Two. Oct. 31, 1986.]

In re the Marriage of ALICE D. and MELVIN W. DANIELS.
MELVIN W. DANIELS, Appellant, v.
ALICE D. DANIELS, Respondent.

**COUNSEL**

Sprague, Milligan & Beswick, Dennis S. Tilton and Richard R. Beswick for Appellant.

Judy R. Bailey for Respondent.

**OPINION**

**KAUFMAN, Acting P. J.**—Husband Melvin W. Daniels appeals from the trial court's order awarding wife Alice D. Daniels 47.3 percent of husband's military retirement/disability benefits and 50 percent of his U.S. Civil Service retirement/disability benefits. Husband contends that military and civil service benefits earmarked for disability are not community property under California and federal law. In the event we conclude wife is entitled to a share of these benefits, husband argues the percentages awarded are incorrect and the trial court improperly included in the award retroactively computed arrearages.

*Factual and Procedural Background*

The parties were married on February 14, 1953, and separated on December 3, 1979. Husband's service in the United States Air Force began

on February 5, 1952, and continued until February 4, 1956. After a two-month hiatus, husband resumed duty April 11, 1956, and thereafter continued uninterrupted until his retirement on August 1, 1972.

On retirement from the service, husband was adjudged by the Air Force to be 40 percent disabled. Under chapter 61 of title 10, United States Code, his disability was then factored into a retirement package which also included the 50 percent longevity pay to which he was entitled for achieving 20 years of active service (the Air Force pension). On July 27, 1979, under title 38 of the United States Code, section 3104 et seq., husband elected to receive disability compensation from the Veterans' Administration (VA) in lieu of the Air Force pension, which he was required to waive to obtain the disability benefits under title 38.

On October 23, 1973, husband went to work for the United States Postal Service, entitling him to membership in the Civil Service Retirement Program. Husband suffered injuries in a May 1978 automobile accident, and accordingly he applied for, and apparently received, civil service retirement benefits based on disability in August 1979. As of October 22, 1979, husband was declared totally disabled by the VA.

An interlocutory judgment of dissolution of marriage was entered on August 23, 1982. In an addendum to that judgment, the parties were found to have waived spousal support. After much of the real and personal community property had been divided, the court reserved jurisdiction to determine community property interests in petitioner's disability and retirement benefits from the military, the VA, and the civil service. The court also reserved jurisdiction to determine husband's community interest in the retirement benefits earned in wife's employment.

On April 10, 1984, wife filed a motion requesting the court to determine her community interest in husband's retirement benefits, to fix the amount of arrearages, and to award attorney's fees. After hearing on the matter, the court made an order calculating and dividing husband's military retirement/disability benefits and determining arrearages. In granting wife portions of such benefits, the court stated: "The fact that part of [husband's] benefits are designated 'disability' does not defeat [wife's] interest therein because longevity alone entitled [husband] to such benefits." The court also granted wife a 50 percent interest in husband's civil service retirement/disability benefits.

Relevant portions of the court's order will be set out in our discussion of the issues.

*Discussion*

1. *Is the State's Authority to Treat Disability Pensions Paid Under Title 38 of the United States Code Preempted Under FUSFSPA?*

Husband's right to disability benefits from his military service appears to have been evaluated twice by the federal government. The first review occurred when he was contemplating retirement after 20 years of service with the Air Force at which time he opted to receive a portion of his benefits as disability benefits rather than longevity benefits, apparently under chapter 61 of title 10, United States Code.

The second occasion for review occurred at about the time husband retired from the postal service. Husband applied to the VA for total disability benefits under title 38 of the United States Code. To obtain disability benefits under title 38, however, husband was required to waive an amount of his Air Force pension equal to the disability compensation he would receive from the VA. (38 U.S.C. § 3105.) The record indicates that husband was receiving $486.77 in gross retirement pay from the Air Force in December 1979, and that this amount would increase incrementally to $655.22 starting in April 1983. The amount of disability compensation to be received from the VA started at $513 per month in February 1980 and increased incrementally to $1,332 per month in April 1984. Starting in August 1980, therefore, he was required to waive the entire amount of his Air Force pension.

██ At the time his retirement benefits were divided by the court, therefore, the amount husband was receiving each month was derived completely from his VA disability compensation received under title 38 of the United States Code. Husband asserts such title 38 disability benefits are preempted from treatment under state community property laws by the Federal Uniformed Services Former Spouses' Protection Act (FUSFSPA), 10 U.S.C. section 1408.[1]

As this court observed in a recent decision, except for the question of federal preemption, "[t]he case at bench would clearly be governed by the California Supreme Court's decision in *Stenquist I* [*In re Marriage of Sten-*

---

[1] 10 U.S.C. section 1408 provides in pertinent part: "(c)(1) Subject to the limitations of this section a court may treat *disposable retired or retainer pay* . . . either as property solely of the member or as property of the member and his spouse in accordance with the law of the jurisdiction of such court." (Italics added.)

Subdivision (a)(4) in turn defines "disposable retired or retainer pay" as ". . . the total *monthly* retired or retainer pay to which a member is entitled (other than the retired pay of a member retired for disability under chapter 61 of this title) less amounts which . . . (B) are required by law to be and are deducted from the retired or retainer pay of such member, including . . . amounts waived in order to receive compensation under . . . title 38 . . . ."

*quist* (1978) 21 Cal.3d 779 (148 Cal.Rptr. 9, 582 P.2d 96)] and the decision of this court in *In re Marriage of Mueller* (1977) 70 Cal.App.3d 66 [137 Cal.Rptr. 129]. In both those decisions it was held that although generally speaking disability retirement pensions are the separate property of the employee spouse, when the employee spouse was also eligible to receive regular longevity retirement benefits at the time he or she retired for disability, '[i]t would be inconsistent with community property principles "to permit [the employee] spouse to transmute what would otherwise be community property into his or her separate property." [Citation omitted.]' (*In re Marriage of Stenquist, supra,* 21 Cal.3d 779, 786, fn. omitted; *In re Marriage of Mueller, supra,* 70 Cal.App.3d 66, 71-72.)" (*In re Marriage of Mastropaolo* (1985) 166 Cal.App.3d 953, 958-959 [213 Cal.Rptr. 26].)

However, our decisions in *Mueller* and *Mastropaolo,* and the Supreme Court's decision in *Stenquist I,* only addressed the community property consequences of a spouse's choosing a disability pension package over a longevity pension package under chapter 61 of title 10. They did not involve waivers of retirement pay to obtain VA disability compensation payments under title 38. Nevertheless, absent persuasive reasons for proceeding otherwise, our approach in this case would be simply to ascertain what portion of the divided asset represented the original longevity pension, in which wife would have had an uncontrovertible community property interest. Under *Stenquist I* and its progeny the remaining portion of the VA disability package would be a separate property asset of husband.

But husband contends this approach cannot be utilized because title 38 disability compensation payments are excluded from the amounts state courts "may treat" as community property under FUSFSPA (see fn. 1, *ante*) and, the argument continues, Congress must have intentionally preempted state community property treatment of such VA benefits. In support of his preemption argument husband relies almost solely upon *In re Marriage of Costo* (1984) 156 Cal.App.3d 781 [203 Cal.Rptr. 85].

The *Costo* court concluded that FUSFSPA's definition of "disposable retired or retainer pay" which requires a deduction of amounts waived to receive compensation under title 38 was intended to preempt California's division of those amounts on dissolutions of marriage. "Congress did not give California the unlimited right to treat military retirement pay in accordance with its general community property laws. It merely provided for the division of *disposable* pay rather than gross retired pay. [The *Costo* decision goes on to list other required deductions included in the definition of 'disposable retired or retainer pay.'] . . . [¶] . . . It is a matter for the legislative branch to determine whether military disability payment is to be divided by the states. It is not for the courts to decide that such payment

is community property because it is deferred compensation or that it is separate property because it is compensation for personal pain and suffering. If it is the latter, there is less reason to award an ex-spouse a portion that continues to be paid even following a subsequent remarriage by the non-service spouse. Congress has used words leaving no room for court-found ambiguity. Disability pay is to be excluded from division by the states [*sic*] courts." (*Id.,* 156 Cal.App.3d at pp. 786-787, 787-788, italics added, fn. omitted.)

However, the reasoning used by the *Costo* court was found unsound by the California Supreme Court in *Casas* v. *Thompson* (1986) 42 Cal.3d 131 [228 Cal.Rptr. 33, 720 P.2d 921] in which the court adopted in full the earlier opinion by Justice Work for Division One of this District. In *Casas* the Supreme Court held that, notwithstanding the language of FUSFSPA, California retains the sovereign power to declare community property interests in portions of *gross* retirement pay and not just in the "disposable" retirement pay. In reaching this conclusion, the court rejected the *Costo* determination of preemption relied upon by husband in the instant case. The court noted that in *Costo,* ". . . the reviewing court merely looked to the face of [FUSFSPA] and determined Congress did not *give* California the unlimited right to treat military retirement pay according to its laws. [¶] [This] argument is founded on a misunderstanding of the holding in *McCarty* . . . ." (*Id.,* 42 Cal.3d at p. 144, orig. italics.)

In *McCarty* v. *McCarty* (1981) 453 U.S. 210 [69 L.Ed.2d 589, 101 S.Ct. 2728], the Supreme Court of the United States ruled that the then-existing congressional scheme regarding military longevity benefits impliedly preempted community property states from treating such benefits as anything other than the separate property of the recipient. The *Casas* decision stresses that the preemption found by the Supreme Court in *McCarty* was *implied:* "Finding no express statement by Congress that state community property laws were preempted in regard to military pensions . . ., the court instead considered a variety of circumstantial evidence, including related statutory schemes and the objectives of the military retirement system, in determining application of state community property laws to military pensions would do such 'major damage' to 'clear and substantial' federal interests as to require a finding of implied preemption under the supremacy clause. [Citations omitted.]

"The *McCarty* holding of implied preemption is thus a contextual one, taking into account all relevant facts and circumstances. Those facts and circumstances have now changed by reason of Congress's enactment of FUSFSPA. . . .

"We note a basic proposition: 'The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states not to the laws of the United States.' (*Ex parte Burrus* (1890) 136 U.S. 586, 593-594 [34 L.Ed. 500, 503, 10 S.Ct. 850].) That Congress was aware of this principle and intended that state laws apply to the characterization of military pensions as community property is made abundantly clear by the legislative history surrounding the enactment of FUSFSPA." (*Casas* v. *Thompson, supra,* 42 Cal.3d at pp. 144-145.)

The illogic of the *Costo* analysis was thus exposed in *Casas.* It is the states' organic power to regulate divisions of property on dissolutions of marriage and their authority to do so is not federally delegated. The federal government only limits that power when it impliedly or explicitly preempts the application of state property dissolution laws in the interest of fostering some more important federal goal. In *McCarty* the United States Supreme Court found such implied preemption. However, as *Casas* pointed out, the basis for a finding of implied preemption was completely removed by Congress's passage of FUSFSPA.

*Casas* also rejects husband's argument, again based on *Costo,* that congressional preemption of state community property treatment of title 38 benefits is proven by FUSFSPA's requirement that such amounts be deducted from gross retirement pay to calculate the "disposable" pay state courts "may treat." "We read section 1408(c)(1) as being aimed at an entirely different proposition. Direct payments were not available to ex-spouses for judgments awarding marital property interests against military retirement pay before the enactment of FUSFSPA. Section 1408 is primarily devoted to establishing a scheme to permit the ex-spouse to 'garnish' retirement pay and, at the same time, to afford the military retiree similar protections previously given other retired federal employees by limiting the amount of funds subject to garnishment." (*Id.,* 42 Cal.3d at p. 148.)

The vitality of the holding in *Costo* was dependent upon the existence of some implied federal preemption with respect to title 38 benefits of the kind found applicable to longevity benefits by the court in *McCarty.* The *McCarty* court might have been likely to discover an even firmer public policy basis for implied federal preemption as to *disability* benefits, because, at least in the abstract, disability benefits do bear a closer relation to the separate property interests of the disabled spouse than do the longevity pensions, which are more aptly viewed as deferred compensation. However, if the *Casas* decision is correct, and we are not at liberty to question that, the United States Supreme Court's conclusions about preemption would be different in view of the enactment of FUSFSPA. Neither party has suggested

an independent, non-FUSFSPA basis for our finding an implied federal preemption in the title 38 context.

## 2. *Resulting Trust*

Even were we to assume arguendo that California is federally preempted from treating title 38 disability benefits as community property, we would conclude, as we did in our *Mastropaolo* decision, that husband would receive his separate property monthly payment from the federal government as a resulting trustee of wife's share.

We believe federal law would embrace as just and in furtherance of FUSFSPA's purposes the resulting trust doctrine we announced in *In re Marriage of Becker* (1984) 161 Cal.App.3d 65 [207 Cal.Rptr. 392], and later reaffirmed in *Mastropaolo*. In *Becker* we relied on the resulting trust doctrine to give effect to a division of state employee death benefits between a former spouse and a surviving spouse even though the statute provided they could be paid only to the surviving spouse. "Our decision in *Becker* was based on the same principle of law as underlay *Stenquist I* and *Mueller,* that one spouse may not be permitted by exercise of a power wholly within that spouse's control to transmute what would otherwise be the community property of both spouses into his or her separate property. [Citations.]

"As we explained in *Becker:* 'It is true that in this case the surviving spouse is to receive a monthly allowance rather than repayment of the accumulated contributions to the retirement system. However, as we shall explain, she was entitled to receive the accumulated retirement contributions *if she so elected,* and the fact that she is to receive a monthly allowance rather than the accumulated contribution *is a product of her own choice. In essence, the surviving spouse has traded her right to receive the accumulated retirement contributions, out of which former wife would have been entitled to reimbursement of her community share* under *Chirmside* [*Chirmside* v. *Board of Administration* (1983) 143 Cal.App.3d 205 (191 Cal.Rptr. 605)], for a monthly allowance. [Italics added.]

"While the surviving spouse *was statutorily entitled to make the choice she did and committed no wrong in so doing, she has effectively utilized former wife's right to reimbursement to acquire, in part, her monthly allowance.* The situation presented is a classic one for the imposition of a resulting trust. When one person furnishes the money or other thing of value with which property is acquired and title to the property is taken in the name of another, absent the intention of the one to confer a gift upon the other, the titleholder is a trustee upon a resulting trust of the property for the benefit of the person who furnished the money or other thing of value

by which the property was acquired. (Civ. Code, § 853; *Keene* v. *Keene* (1962) 57 Cal.2d 657, 665 [21 Cal.Rptr. 593, 371 P.2d 329]; *Viner* v. *Untrecht* (1945) 26 Cal.2d 261, 269 [158 P.2d 3]; *Martin* v. *Kehl* (1983) 145 Cal.App.3d 228, 238-239 [193 Cal.Rptr. 312]; see Rest.2d Trusts, §§ 440, 455; 7 Witkin, Summary of Cal. Law (8th ed. 1974) §§ 126-128, pp. 5484-5486.) Where only a portion of the acquisition price has been furnished, a resulting trust may be established in a fractional interest in the property on a *pro tanto* basis. (*Keene* v. *Keene, supra,* 57 Cal.2d 657, 665; *Watson* v. *Poore* (1941) 18 Cal.2d 302, 317 [115 P.2d 478]; *Juranek* v. *Juranek* (1938) 29 Cal.App.2d 276, 281 [84 P.2d 195]; see Rest.2d Trusts, § 454.)' (*In re Marriage of Becker, supra,* 161 Cal.App.3d 65, 74-75, fn. omitted, italics added.)

"The same logic should apply here. So far as we are aware the federal courts recognize the resulting trust doctrine in appropriate circumstances, and we are confident they would find it appropriate here to further the congressional intent to protect spouses of service personnel that is manifest in FUSFSPA." (*In re Marriage of Mastropaolo, supra,* 166 Cal.App.3d at pp. 963-964.)

Under FUSFSPA, at the time the military spouse becomes eligible for longevity retirement the nonmilitary spouse's right to share in the retirement benefits becomes fully recognized, and it was the specific purpose of FUSFSPA to recognize and protect the rights of military spouses. We are confident federal law would not be interpreted to permit one spouse at his or her election to defeat the other spouse's fully recognized rights any more than California law does.

Despite husband's urging we should do so, we decline to disavow our approach in *Mastropaolo*.

3. *Propriety of the Percentages Awarded Wife*

The pertinent portions of the court's order in respect to division of the retirement/disability benefits read as follows: "[Wife] should be awarded 50% of [husband's] retirement/disability benefits from the U.S. Civil Service employment effective September 1, 1982. Said employment coupled with credit for prior military service entitled [husband] to retirement benefits based on longevity. The court has not been presented with evidence as to the actual dollar amounts [husband] has received." Further: "[Wife] is awarded as her separate property 47.3% of [husband's] retirement/disability benefits to which [husband] was entitled due to his military service, and 50% of [husband's] retirement/disability benefits from his U.S. Civil Service employment. [Wife's] interest shall accrue effective Sept. 1, 1982." And

finally: "[Husband] is awarded 52.7% of his military retirement/disability benefits as his separate property. Reference to [husband's] military retirement/disability benefits means monies received by [husband] from the Veterans' Administration or other payor that are being received by [husband] due to his waiver of military retirement and notwithstanding the fact that a portion of his military retirement was designated disability. In the event [husband's] U.S. Civil Service retirement is being paid in a similar manner, this interpretation applies to said benefits as well."

■ Although husband's contentions in this regard are far from clear, his argument that the court erred in awarding wife any part of these retirement/disability benefits also encompasses some suggestion that the percentages awarded wife were erroneous even if she was entitled to share therein. That is obviously so with respect to the civil service retirement/disability benefits. The court simply awarded wife 50 percent thereof noting that no figures had been supplied to it showing what husband actually received. That disposition does not comply with the law as laid down in *Marriage of Stenquist, supra,* 21 Cal.3d 779 and *In re Marriage of Mueller, supra,* 70 Cal.App.3d 66 that any benefits received by the military spouse over and above what he or she would have received as longevity benefits constitutes the separate property of the military spouse. Strangely enough, in computing the arrearages on the military retirement/disability benefits (see discussion, *infra*) the court did conform to *Stenquist,* comparing what husband actually received in retirement/disability benefits with what he would have received as longevity benefits. The case will have to be remanded to the trial court to determine what if anything husband received since September 1, 1982, as civil service disability benefits over and above what he would have received as longevity benefits.

The same problem appears to exist with respect to the division of the military retirement/disability benefits. Although husband was awarded 52.7 percent and wife only 47.3 percent of these benefits, it is our understanding that the unequal division was based entirely on the fact that husband's military service commenced one year before the marriage. Although the court took into consideration in ascertaining the arrearages the fact that husband was receiving more under the combined retirement/disability package than he would have solely for longevity retirement, that principle does not seem to have been applied to the division of the benefits between the spouses.

As noted, *ante,* the court specifically stated: "The fact that part of [husband's] benefits are designated 'disability' does not defeat [wife's] interest therein because longevity alone entitled [husband] to such benefits." Though this finding is stated in terms broad enough to reflect an application of

*Stenquist* principles, the record lacks substantial evidence to support a conclusion that husband's benefits included nothing over and above what he would have received as longevity benefits. Indeed, the indications are to the contrary.

Accordingly, the case must also be remanded for proper ascertainment of the fact whether any such additional disability benefits were received with respect to the military benefits and, if so, for a recomputation of the percentages to which each spouse is entitled.

### 4. *Calculation of Arrearages*

■ Finally, husband attacks the trial court's calculation of arrearages, stating: "[Husband] rhetorically asks why he should have to share retroactively in benefits he accrued through disability occurring more than twenty years before he was declared totally disabled, when he, not [wife] suffered the pain of injuries and did not receive compensation for them himself until much, much later in time. [Husband] contends that the trial court's action unjustly enriches [wife] and any shared benefits should date much closer to the present."

The court explained its determining the arrearages from September 1, 1982: "[Husband] was put on notice of [wife's] claim to her share of said benefits at [the] time of trial and, except for the uncertain state of the law at that time and the recent change thereof, [wife] would have started to receive her share on September 1, 1982." We discern no error in this regard.

We also observe that in respect to the arrearages, the trial court engaged in a thorough, careful and detailed mathematical computation to ascertain exactly what wife's share of the community property *longevity* pension would have been, and, in turn, what portion of husband's VA benefits represented additional compensation attributable to disability. The proportional amounts awarded to husband represent his community property share in the original longevity payment *plus* the amounts due to disability alone which he owns as his separate property. The final resulting order also reflects an offset due husband for amounts he is owed for his community interest in wife's retirement benefits which were awarded to her.

### *Disposition*

The order of the trial court dated May 13, 1985, is reversed only as to the percentages awarded husband and wife of the military retirement/disability benefits and the U.S. Civil Service retirement/disability benefits and the case is remanded to the trial court for a redetermination of these percentages in accordance with the *Stenquist* and *Mueller* decisions. In all other

respects the order is affirmed. Respondent (wife) shall recover costs on appeal.

Rickles, J., and Dorr, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.